## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AgFeed USA, LLC, et al.,[1] | Case No. 13- 11761 |
| Debtors. | Joint Administration Requested |

## DECLARATION OF KEITH A. MAIB IN SUPPORT
## OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Keith A. Maib, do hereby submit this declaration (the "Declaration") and declare under penalty of perjury that the following information is true and correct to the best of my knowledge, information and belief.

1.       I am a Senior Managing Director of Mackinac Partners, LLC ("Mackinac") since 2008 and am the current Chief Restructuring Officer ("CRO") for AgFeed Industries, Inc. ("AgFeed Industries"), headquartered in Hendersonville, Tennessee, and AgFeed USA, LLC ("AgFeed USA"), headquartered in Ames, Iowa, and each of its above-captioned affiliated subsidiaries and debtors-in-possession (each, a "Debtor" and collectively, the "Debtors"). I am also a member of the Board of Managers for AgFeed USA. I have held these positions since May 2013. In my capacities with the Debtors and Mackinac, I have detailed knowledge of and experience with the business and financial affairs of the Debtors as well as extensive experience in leading companies in distressed situations. More specifically, I have over 25 years of

---

[1]  The Debtors and the last four digits of their federal tax identification number are:  AgFeed USA, LLC (8748), AgFeed Industries, Inc. (7168); TS Finishing, LLC (8748); New York Finishing, LLC (8748); Pork Technologies, LC (2076); New Colony Farms, LLC (9246); Heritage Farms, LLC (8141); Heritage Land, LLC (8129); Genetics Operating, LLC (1921); M2P2 Facilities, LLC (8748); MGM, LLC (8748); M2P2 General Operations, LLC (8748); New Colony Land Company, LLC(5834); M2P2 AF JV, LLC (8748); Midwest Finishing, LLC (8748); and Genetics Land, LLC (1921).  The location of the corporate headquarters for AgFeed Industries, Inc. is 100 Bluegrass Commons Blvd., Suite 310, Hendersonville, Tennessee 37075.  The location of the corporate headquarters for the remaining Debtors is 510 South 17th Street, Suite 104, Ames, Iowa 50010.

diversified business experience, including serving as a partner in two international accounting firms, Chief Executive Officer of the world's largest manufacturer of commercial playground equipment, Chief Operating and Marketing Officer of the world's second largest developer and marketer of vacation ownership interests, Chief Financial Officer for the fifth largest insurance brokerage firm in the world and Chief Operating Officer of a major company and two telecommunication companies. As a result, I have extensive experience in leading companies through periods of pervasive change and turmoil and I am nationally recognized as a leading turnaround executive with experience in the insurance (both P&C and Life), telecommunications, hospitality, retail, real estate, technology and manufacturing industries.

2. In my capacity as CRO for the Debtors, I am responsible for implementing the Debtors' business plans and strategies and for generally overseeing the Debtors' business and operations as they relate to their financial affairs. Accordingly, I have been involved in the Debtors' restructuring process (the "Restructuring"), which includes but is not limited to: (i) participating and overseeing the process of pursuing and consummating the sale of any or all of the Debtors' assets; (ii) participating in the development, negotiation and implementation of various strategic alternatives for recasting, reducing or modifying the Debtors' indebtedness; (iii) managing the professionals engaged by the Debtors in connection with the Restructuring; (iv) supervising the preparation of the documentation necessary to implement the Restructuring; (v) managing and negotiating the Debtors' relations with its creditors, including the Lenders (as defined below), and (vi) consulting with the Debtors' other officers, executives and managers, and members of the AgFeed Industries Boards of Directors, with respect to the foregoing.

3. On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition (collectively, the "Petitions") for relief under chapter 11 of title 11 of the United States

Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), and each thereby commenced chapter

11 cases (collectively, the "Chapter 11 Cases") in this Bankruptcy Court (the "Court") in an

effort to preserve and maximize the value of their businesses, assets and chapter 11 estates.

4. The Debtors intend to operate their businesses and manage their assets and

properties as "debtors-in-possession" under sections 1107(a) and 1108 of the Bankruptcy Code.

5. I have been advised by counsel that the Court has jurisdiction over these Chapter

11 Cases pursuant to 28 U.S.C. §§ 157 and 1334. In addition, I have also been advised by

counsel that venue of these Chapter 11 Cases is proper in this District pursuant to 28 U.S.C. §§

1408 and 1409.

**a.** **Corporate Structure and History and Overview of Business Operations**

 (i) Corporate Structure and History

6. AgFeed Industries was established in 1995 as a feed producer in China and has

subsequently become one of the leading hog producers in China. Its operations are conducted

through its various non-Debtor foreign subsidiary entities in China and the British Virgin Islands.

At its inception, its primary focus was the sale of pre-mix feed product which was developed for

use at various stages of a hog's life. It subsequently became a public company and listed on the

NASDAQ.[2] In 2007, in an effort to establish itself as a larger market participant and to better

---

[2] In 2011, the Board of Directors of AgFeed Industries discovered certain accounting irregularities, and as a consequence, launched an internal investigation which was conducted by the law firm of Latham & Watkins, LLP. At the conclusion of the investigation, it was determined that each of the parties responsible for the accounting irregularities were Chinese nationals based in China and that no members of the management team of AgFeed USA or its subsidiaries were involved. As the result of the accounting irregularities, AgFeed Industries began the process of restating historical financials. Nonetheless, AgFeed Industries and a number of its current and former executive officers and directors are parties to a consolidated class action lawsuit in the United States District Court for the Middle District of Tennessee, Case No. 11-cv-01087, which was filed on October 18, 2011 and which stems from the alleged misrepresentations made by them. Additionally, the United States Securities and Exchange Commission is conducting a formal civil investigation into possible violations, and the United States Department of Justice is conducting a parallel grand jury investigation. As the result of the ongoing civil and criminal investigations, the Board of Directors of AgFeed Industries, among other things, terminated all parties involved with the accounting irregularities, reconstituted the Board of Directors, restructured the management team and voluntarily delisted from the NASDAQ on February 1, 2012.

utilize its feeding mills, AgFeed Industries, through its non-Debtor foreign subsidiary entities, expanded its operations in China by entering the Chinese hog production market, thus also making it a leading hog producer in China.

7.      AgFeed Industries subsequently sought to further expand its operations into the U.S. hog production market and take advantage of the more advanced and modernized production facilities and management techniques in the U.S. market. Accordingly, in September 2010, AgFeed Industries purchased (the "Sale") a leading U.S. hog producer, M2P2, LLC (now known as AgFeed USA)[3] and each of its subsidiaries from AF Sellco ("AF Sellco").

8.      Accordingly, AgFeed USA, a Delaware limited liability company, is a wholly-owned subsidiary of AgFeed Industries. M2P2 General Operations, LLC ("M2P2 General"), MGM, LLC ("MGM"), TS Finishing, LLC ("TS Finishing"), New York Finishing, LLC ("New York Finishing"), M2P2 Facilities, LLC ("M2P2 Facilities") and M2P2 AF, JV, LLC ("M2P2 AF"), each Delaware limited liability companies, are wholly-owned subsidiaries of AgFeed USA. Midwest Finishing, LLC ("Midwest Finishing"), a Delaware limited liability, Genetics Operating LLC ("Genetics Operating"), a Colorado limited liability company, Pork Technologies, L.C. ("Pork Technologies"), an Iowa limited liability company, New Colony Farms, LLC ("New Colony Farms"), a North Carolina limited liability company and Heritage Farms, LLC ("Heritage Farms"), a Colorado limited liability company, are each wholly-owned subsidiaries of M2P2 General. Heritage Land, LLC ("Heritage Land"), a Colorado limited liability company, New Colony Land Company, LLC ("New Colony Land"), a North Carolina limited liability company, and Genetics Land, LLC ("Genetics Land") are wholly-owned

---

[3]  In February 2012, M2P2, LLC changed its name to AgFeed USA, LLC.

subsidiaries of M2P2 Facilities.  For the Court's convenience, a corporate organizational chart is attached hereto as Exhibit A.

      (ii)    Overview and Business Operations

          (a)    *AgFeed Industries and Its Non-Debtor Subsidiaries*

    9.    AgFeed Industries oversees and manages the Chinese operations (the "Chinese Operations") of its non-Debtor Chinese and British Virgin Island affiliates (collectively, the "Foreign Non-Debtors").  Through the Chinese Operations, the Foreign Non-Debtors maintain twenty-one (21) commercial farms and five (5) feed mills in China which produce over a quarter million hogs annually.  AgFeed Industries employs five (5) full-time staff whose expertise in the hog production field provides oversight and management services to both the Foreign Non-Debtors and to AgFeed USA and its Debtor subsidiaries.  Pursuant to a management services agreement, AgFeed USA pays for the services provided to it and its subsidiaries through monthly intercompany transfers from AgFeed USA to AgFeed Industries.

          (b)    *AgFeed USA and Its Debtor Subsidiaries*

    10.    As the result of the Sale, AgFeed USA and its Debtor subsidiaries retained the then existing purchase and supply arrangements with Hormel Foods Corporation ("Hormel") and immediately became one of the leading hog producers in the U.S.  Through their approximately 200 full-time and part-time employees and their integrated use of ten (10) sow farms in North Carolina, Oklahoma and Colorado and two (2) feed mills located in North Carolina and Colorado, the Debtors produce over one (1) million hogs annually.[4]  The hog production operation is known in the industry as a "Farrow to Finish Operation," which includes all hog

---

[4] The Debtors also maintain offices in Turbin, Oklahoma; Lamar, Colorado; and Columbia, North Carolina to manage day-to-day operations at their sow farms and feed mills.

production phases from breeding, to farrowing, to grow-finishing, to producing the actual finished hogs to market.

11.     As a part of their U.S. operations, certain of the Debtors either purchase their hogs or breed their hogs at one of their sow farms using boars purchased from certain third parties. The Debtors' feed mill in North Carolina produces finished feed products for use at the Debtors' North Carolina sow farms, and the feed mill in Colorado produces finished feed products for the Debtors' Colorado and Oklahoma sow farms.

12.     Once the hogs are weaned from the sow (a process known as "farrowing"), they are transported to one of the contracted finishing farms (collectively, the "Finishing Farms") located in Iowa until the hog reaches approximately 265 lbs.  In accordance with the terms and conditions of separate agreements, the "finishing" is conducted on a "finishing farm" by one of the Debtors' approximately 200 independent contractors known as "contract growers" (collectively, the "Contract Growers").  The Contract Growers, the vast majority of which are family farmers, are responsible for all aspects involved in getting the hogs to market, including, but not limited to, feeding and providing veterinary care.  The Debtors, however, procure the feed used by the Contract Growers from eight (8) separate independent feed mills in Iowa.  At the completion of the finishing process, the Debtors' hogs are marketed and sold, almost exclusively to Hormel, pursuant to certain hog procurement agreements and weanling agreements (as subsequently amended or modified) which are more fully described below.

13.     In 2012, the Debtors' gross revenue as the result of the U.S. business operations was approximately $244 million.

**b.**    **Pre-Petition Secured Debt Structure**

14.    Prior to the Petition Date, AgFeed USA and certain of its Debtor subsidiaries, as borrowers (collectively, the "Borrowers"), and Farm Credit Services of America, PCA and Farm Credit Services of America, FLCA, as the lenders (together, "Farm Credit" or the "Lenders"), were parties to that certain Credit Agreement, dated June 7, 2006, as amended, supplemented or otherwise modified from time to time (the "Farm Credit Loan Agreement"), pursuant to which Farm Credit made available to the Debtors certain credit facilities (collectively, the "Farm Credit Facility"). As of the Petition Date, the Farm Credit Facility consisted of a revolving loan in the approximate amount of $60.1 million (the "Farm Credit Revolving Loan") and a term loan in the approximate amount of $8.4 million (the "Farm Credit Term Loan").

15.    The current principal balance on the Farm Credit Revolving Loan is approximately $60.1 million. Pursuant to the Farm Credit Loan Agreement, the Borrowers make monthly payments on the accrued interest and it matured on or about February 1, 2013. The current principal balance on the Farm Credit Term Loan is approximately $8.4 million. Pursuant to the Farm Credit Loan Agreement, the Borrowers must make monthly installment payments, on account of the Farm Credit Term Loan, in the approximate amount of $181,500. The Farm Credit Term Loan also matured on or about February 1, 2013. The Borrowers' obligations under the Farm Credit Loan Agreement are secured by substantially all of the Borrowers' assets.

**c.**    **Events Leading to the Debtors' Chapter 11 Cases**

16.    Prepetition, certain of the Debtors and affiliates of Hormel were parties to two (2) long-term weanling agreements; namely, (i) that certain Weanling Pig Sales Agreement, dated January 1, 2010, by and between TS Finishing, LLC and Mountain Prairie, LLC (the "TS Finishing Weanling Agreement"), and (ii) that certain Weanling Pig Sales Agreement, dated

January 1, 2010, by and between Midwest Finishing, LLC and CHAMP, LLC (the "Midwest Weanling Agreement," and together with the TS Finishing Weanling Agreement, the "Weanling Agreements"). Pursuant to the Weanling Agreements, Hormel agreed to sell and the Debtors agreed to buy approximately 640,000 weanling pigs per year or roughly a little more than half of the Debtors' hog supply. The balance of the Debtors' hogs that are ultimately produced to market are almost exclusively bred by the Debtors at their own sow farms.

17.    In addition, certain of the Debtors (collectively, the "Producers") were also parties to three (3) long-term hog procurement agreements with Hormel; namely, (i) that certain Hog Procurement Agreement, dated January 1, 2010, by and between MGM, LLC, as producer, and Hormel (the "MGM Procurement Agreement"), (ii) that certain Hog Procurement Agreement, dated January 1, 2010, by and between Midwest Finishing, LLC, as producer, and Hormel (the "Midwest Finishing Procurement Agreement"), and (iii) that certain Hog Procurement Agreement, dated January 1, 2010, by and between TS Finishing, LLC, as producer, and Hormel (the "TS Finishing Procurement Agreement,"[5] and together with the Midwest Finishing Procurement Agreement and the MGM Procurement Agreement, collectively, the "Procurement Agreements"). It is through the Weanling Agreements and Procurement Agreements (together, the "Hormel Agreements")[6] that the Debtors produce their finished hogs.

18.    Pursuant to the Procurement Agreements, certain Debtors, as producers, agreed to sell, and Hormel agreed to buy, the Debtors' entire hog output. Through the use of various independent shippers, the hogs that are produced are delivered to one of Hormel's two largest

---

[5] In connection with the TS Finishing Procurement Agreement, Hormel also issued the Debtors an unsecured note (the "TS Finishing Note") in the approximate amount of $5.8 million.

[6] The descriptions of the Hormel Agreements are being provided for the benefit of the Court and other parties-in-interest. However, to the extent that there are inconsistencies between the descriptions provided herein and the actual terms and conditions of the Hormel Agreements, the actual terms and conditions of the Hormel Agreements shall govern.

processing facilities located in Austin, Minnesota and Fremont, Nebraska. In the fiscal year 2012, the Debtors delivered over 1.3 million hogs to the Hormel facilities, making the Debtors the largest supplier of hogs to those locations. All of the Producers' obligations under the Procurement Agreements are guaranteed by AgFeed USA.

19.     Pursuant to the Procurement Agreements, Hormel agreed to pay the Debtors, upon delivery of a load of hogs to their facility, an agreed upon percentage of the actual market price (the "Market Price") of the hog as reported on a weekly basis by the *USDA Market News*. These payments were typically made within one (1) week of a delivery of a lot of hogs.

20.     The Procurement Agreements also each utilized certain pricing mechanisms; namely, market ledgers,[7] production ledgers and quarterly settlements which were designed to lessen the negative impact on AgFeed USA of market fluctuations in production costs and the market prices for hogs. In addition, the parties contemporaneously executed a Sales Price Adjustment Addendum which was also designed to further adjust for the fluctuations in market price and production costs. As the result of these pricing mechanisms, Hormel essentially absorbed any temporary imbalances in the market pricing and the appropriate adjustments were made on a quarterly basis through the quarterly settlements and the Sales Price Adjustment Addendum.

21.     On August 31, 2012, as the result of the previously described business relationship, Hormel initiated an arbitration proceeding over the alleged misallocation of certain overhead costs of AgFeed Industries to AgFeed USA which resulted in an alleged overstatement

---

[7] In accordance with each of the Procurement Agreements, the parties maintained a market ledger (the "Market Ledger"). Pursuant to the Procurement Agreements, if the Market Price was greater than the parties' agreed upon standard cost of producing a hog to market (the "Matrix Cost") (i.e., Hormel was overpaid), then the difference between the Market Price and the Matrix Cost was added to the Market Ledger (the "Market Ledger") for that particular Procurement Agreement. If, on the other hand, the Market Price was less than the Matrix Cost (i.e. Hormel was underpaid), then the Market Ledger's balance (the "Market Ledger Balance") for that particular Procurement Agreement was reduced by the difference between the Market Price and the Matrix Cost.

with respect to AgFeed USA's production costs.  On September 12, 2012, AgFeed USA filed a counterclaim against Hormel for damages as the result of Hormel supplying the Debtors with unhealthy hogs and for its failure to make certain payments due to the Debtors under the Hormel Agreements.

22.    On September 10, 2012, Hormel also gave written notice of its intent to terminate the Weanling Agreements.  Thus, pursuant to its terms, the Midwest Weanling Agreement was set to terminate on September 10, 2014 (or two (2) years after the notice was given), and the TS Finishing Weanling Agreement was set to terminate on April 27, 2018.  Simultaneously, Hormel also gave written notice of its intent to terminate the MGM Procurement Agreement and the TS Finishing Procurement Agreement.  By its terms, the MGM Procurement Agreement was set to terminate either on (i) September 10, 2014 if the Market Ledger Balance was zero or (ii) such date after September 10, 2014 when the Market Ledger Balance became zero.  Per the agreement, the TS Finishing Procurement Agreement would terminate either on (i) October 5, 2018 if the Market Ledger Balance was zero or (ii) such date after October 5, 2018 when the Market Ledger Balance became zero.  The Midwest Finishing Procurement Agreement terminated when the last hogs from the Midwest Weanling Agreement were delivered to Hormel.

23.    In connection with the arbitration, on January 9, 2013, the arbitrator issued a partial final award pursuant to which he found in favor of Hormel with respect to the misallocation of AgFeed Industries' overhead costs and the overstatement of production costs and found in favor of the Debtors with respect to the poor health of certain of the hogs supplied to the Debtors and the late payment in certain quarters.[8]  The arbitrator's decision resulted in Hormel receiving a net award of $7.9 million which was satisfied in full by a setoff against

---

[8]  The arbitrator withheld his ruling to a date to be determined concerning whether Hormel was also entitled to legal fees and interest with the anticipation of issuing a supplemental ruling on same.

amounts that were otherwise payable by Hormel to the Debtors in January 2013 as part of the quarterly settlements under the Procurement Agreements.

24.     Hormel subsequently initiated a second arbitration proceeding seeking changes to the standard prices used in calculating the quarterly settlement payments under the Procurement Agreements and seeking unspecified monetary damages.

25.     The Debtors believe that a major portion of the arbitration award to Hormel, as well as some of the new claims that were asserted by Hormel in the second arbitration proceeding, were attributable to the accounting practices employed by M2P2, LLC with respect to the Hormel Agreements prior to the Sale.  Accordingly, the Debtors believe that they are entitled to indemnification from AF Sellco with respect to certain portions of the arbitrator's award.  Accordingly, on November 29, 2012 and January 16, 2013, the Debtors delivered their demand for indemnification to AF Sellco and are in the process of pursuing those claims.

26.     The aforementioned arbitration decision constituted an event of default under the Farm Credit Loan Agreement.

27.     In addition, the obligations under the Farm Credit Facility matured on or about February 1, 2013, and the Borrowers have not repaid the amounts due thereunder.

(i)     Hormel Settlement

28.     Notwithstanding Hormel's notice of intent to terminate the Hormel Agreements and the ongoing arbitration, the parties initiated negotiations in an effort to reach a global resolution with respect to the business relationship going forward and the ongoing disputes related thereto.  As a result of the discussions, the parties to the Hormel Agreements entered into that certain Termination and Settlement Agreement, dated April 1, 2013 (the "Settlement and Termination Agreement") which provides for, among other things, a modified business

relationship between the parties and an orderly wind down of the business relationship by
December 31, 2013.

29.    More specifically, the Settlement and Termination Agreement provided, in part,
that: (i) the Procurement Agreements were terminated and the parties would enter into three (3)
new hog procurement agreements; (ii) the parties would enter into amendments to the Weanling
Agreements; (iii) the TS Finishing Note was terminated; (iv) Hormel would dismiss, with
prejudice, the arbitration action against the Debtors and AgFeed USA and its Debtor affiliates
would dismiss, with prejudice, any counterclaims; (v) AgFeed USA and the Producers issued a
non-interest bearing, unsecured note in the approximate amount of $2.84 million payable on
December 31, 2014; and (vi) the parties released any and all claims against the other party in
connection with the Hormel Agreements, including, but not limited to, any claims related to the
Market Balance Ledger.

30.    Contemporaneously upon entry into the Settlement and Termination Agreement,
certain of the Debtors entered into three (3) new short-term hog procurement agreements with
Hormel; namely, (i) that certain Hog Procurement Agreement, dated April 1, 2013, by and
between MGM, LLC, as producer, and Hormel (the "2013 MGM Procurement Agreement"), (ii)
that certain Hog Procurement Agreement, dated April 1, 2013, by and between Midwest
Finishing, LLC, as producer, and Hormel (the "2013 Midwest Finishing Procurement
Agreement"), and (iii) that certain Hog Procurement Agreement, dated April 1, 2013, by and
between TS Finishing, LLC, as producer, and Hormel (together with the MGM Procurement
Agreement and the Midwest Finishing Procurement Agreement, collectively, the "2013
Procurement Agreements").[9]  Pursuant to the 2013 Procurement Agreements, certain of the

---

[9]  The descriptions of the 2013 Procurement Agreements are being provided for the benefit of the Court and other
parties-in-interest.  However, to the extent that there are inconsistencies between the descriptions provided herein

Debtors have agreed to sell, and certain Hormel entities have agreed to buy, all of the hogs that the Debtors produce to market at an agreed upon base price for each hog produced minus certain agreed upon deductions. Under the terms of the 2013 Procurement Agreements, the agreements terminate the earlier of: (i) December 31, 2013; or (ii) the date on which the last hog purchased by a Debtor under the Weanling Agreements (as amended) is delivered to Hormel.

31.    Also, in connection with the Termination and Settlement Agreement, on April 1, 2013, certain of the Debtors and Hormel also executed amendments to the TS Finishing Weanling Agreement and the Midwest Weanling Agreement which, among other things, terminate the Weanling Agreements effective June 30, 2013.

(ii)    <u>Farm Credit Forbearance Agreement</u>

32.    As the result of subsequent negotiations between the Debtors and Farm Credit, the parties entered into that certain forbearance agreement by and between the Debtors and Farm Credit, dated February 1, 2013, as subsequently amended, supplemented or otherwise modified from time to time (the "<u>Forbearance Agreement</u>"), pursuant to which Farm Credit agreed not to take any action to enforce its rights under the Farm Credit Loan Agreement as the result of the Borrowers' default until the earlier of (i) the Borrowers' breach of the Forbearance Agreement or (ii) July 1, 2013, to enable the Debtors and Farm Credit time to explore restructuring options. The Forbearance Agreement was not extended, but Farm Credit has taken no action to exercise remedies since the expiration.

d.    **Proposed Sale**

33.    The Debtors, in consultation with their professional advisors, have diligently evaluated a number of options to address their current liquidity issues. Based on the Debtors'

---

and the actual terms and conditions of the 2013 Procurement Agreements, the actual terms and conditions of the 2013 Procurement Agreements shall govern.

evaluation, the Debtors have concluded that a sale of all or substantially all of the assets of

AgFeed USA and its Debtor subsidiaries was the best way to maximize value for their

stakeholders. To that end, on or about March 25, 2013, the Debtors and their professional

advisors began a robust and aggressive marketing effort which resulted in several expressions of

interests. After consideration of the various expressions of interest, the Debtors entered into that

certain Asset Purchase Agreement Among The Maschhoffs, LLC ("Maschhoffs"), as buyer, and

AgFeed USA, LLC, M2P2 General Operations, LLC, Midwest Finishing LLC, Genetics

Operating LLC, Pork Technologies, L.C., New Colony Farms LLC, Heritage Farms LLC, MGM,

LLC, TS Finishing, LLC, M2P2 Facilities, LLC, Heritage Land, LLC, New Colony Land

Company, LLC, Genetics Land, LLC, and M2P2 AF JV, LLC, as sellers, dated July 15, 2013

(the "APA"), pursuant to which, subject to Court approval, Maschhoffs has agreed to purchase

substantially all of the assets of AgFeed USA and its Debtor subsidiaries for approximately $79

million, subject to certain working capital adjustments. The Debtors have determined that the

floor established by the proposed sale to Maschhoffs (the "Proposed Sale"), subject to higher and

better bids with approval of the Court in an open auction process pursuant to section 363 of the

Bankruptcy Code, affords AgFeed USA, the best opportunity to maximize value for their

stakeholders. Accordingly, concurrently with the filing of their bankruptcy petitions, the Debtors

anticipate filing the *Debtors' Motion for Entry of (A) an Order (I) Scheduling a Hearing on the*

*Approval of the Sale of All or Substantially All of the Assets of AgFeed USA, LLC and Its Debtor*

*Subsidiaries, and the Assumption and Assignment of Certain Executory Contracts and Unexpired*

*Leases, (II) Approving Certain Bidding Procedures, Certain Assumption and Assignment*

*Procedures, the Break-Up Fee, and the Expense Reimbursement, and the Form and Manner of*

*Notice Thereof, and (IV) Granting Related Relief; and (B) an Order (I) Approving a Certain*

*Asset Purchase Agreement, (II) Authorizing the Sale of All or Substantially All of the Sellers'*

*Assets Free and Clear of All Encumbrances, (III) Authorizing the Assumption and Assignment of*

*Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief.*

34.      The Debtors believe that the commencement of these Chapter 11 Cases and the

implementation of an orderly sale process, under the supervision of this Court and with

Maschhoffs providing a floor against which other interested parties may bid, will permit the

Debtors to consummate a going concern sale of all or substantially all of the assets of AgFeed

USA and its Debtor subsidiaries, and thus maximize value of their estates for all interested

parties.

35.      The Debtors and their professionals are:  (i) continuing to actively pursue

competing offers for the assets of AgFeed USA as well as any of its remaining assets which are

primarily comprised of the sow farm operations in Oklahoma and (ii) actively marketing the

assets of AgFeed Industries and its Chinese subsidiaries.  However, these discussions have not

yet resulted in any formal commitments other than entry into the APA with Maschhoffs as

described above.

**e.      First Day Pleadings**

36.      I have formed opinions as to (i) the urgency and necessity for obtaining the relief

sought by the Debtors in their several "first-day" applications and motions described herein

(collectively, the "First Day Pleadings"),[10] (ii) the need for the Debtors to continue to effectively

operate and, as seamlessly as possible, embark upon their Chapter 11 Cases (and the

methodologies to be employed in furtherance thereof), (iii) the deleterious effects upon the

Debtors' employees, customers, creditors and estates if the Debtors do not obtain the requested

---

[10]  Capitalized terms not otherwise defined herein shall have the meaning attributed to them in the relevant First Day
Pleading.

01:13716243.7

relief, and (iv) the immediate and irreparable harm that the Debtors and their estates will be exposed to in the event that this Court does not approve the relief requested in the First Day Pleadings. My opinions are based upon my first-hand experience as CRO of the Debtors and as the result of my review of various materials and information, discussions with other executives of the Debtors and discussions with the Debtors' advisors.

37.    This Declaration is submitted in support of the Debtors' Petitions and this Court's entry of orders approving the relief requested in all of the First Day Pleadings.

38.    I have reviewed each of the First Day Pleadings, and participated together with other of the Debtors' personnel in the preparation thereof. I believe, to the best of my knowledge, that the facts and circumstances set forth in the Petitions and the First Day Pleadings are true and correct. This representation is based upon information and belief and through my review of various materials and information, as well as my history and experience with, and knowledge of, the Debtors' operations and financial condition. Based upon the foregoing, if called to testify before this Court, I could and would testify competently to the facts set forth in each of the First Day Pleadings.

39.    The relief sought in the First Day Pleadings will minimize the adverse impact of these Chapter 11 Cases on the Debtors, their employees, customers, suppliers, and other creditors and interested parties, and will maximize value for the Debtors' creditors. I believe that the relief sought in the First Day Pleadings is necessary and essential to enable the Debtors to operate effectively as debtors-in-possession in their Chapter 11 Cases.

40.    As described more fully below, the Debtors carefully designed the relief requested in the First Day Pleadings in consultation with their advisors to ensure that the Debtors' immediate operational needs are met and that the Debtors (and other constituencies) will not

suffer any immediate and irreparable harm as a result of the commencement of the Chapter 11

Cases. As indicated, I participated in the analyses that led to the development of each of the First

Day Pleadings. The relief requested therein – as briefly articulated below and more fully in the

First Day Pleadings – is tailored to address those matters, issues and requirements that need

urgent and immediate attention by this Court in order to sustain the value and viability of the

Debtors' business operations.

      (i)      Debtors' Motion for Order Authorizing Joint Administration
              <u>Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1</u>

      41.     The Debtors believe that many of the motions, applications, hearings and orders

that will arise in these Chapter 11 Cases will collectively affect each of the Debtors. For this

reason, the Debtors believe that the interests of the Debtors, their creditors, and all other parties

in interest would be best served by the joint administration of these Chapter 11 Cases. The

Debtors further believe that in order to optimally and economically administer the Debtors'

pending Chapter 11 Cases, said cases should be jointly administered, for procedural purposes

only, under the case number assigned to AgFeed USA. The Debtors believe that joint

administration will also significantly reduce the volume of paper that otherwise would be filed

with the Clerk of this Court, render the completion of various administrative tasks less costly,

provide for greater efficiencies and simplify supervision of the administrative aspects of these

Chapter 11 Cases by the Office of the United States Trustee for the District of Delaware (the

"<u>U.S. Trustee</u>").

      42.     For these reasons, I believe, and the Debtors submit, that the relief requested in

this motion is in the best interests of the Debtors, their estates and creditors, and should therefore

be approved.

(ii)    Debtors' Application for an Order Authorizing and Approving
the Appointment of BMC Group, Inc. as Claims and Noticing
Agent Pursuant To 28 U.S.C. § 156(c), Section 105(a) of the
Bankruptcy Code and Local Rule2002-1(f)

43.    By this motion, the Debtors seek authority to retain and employ BMC Group, Inc.

as their claims and noticing agent (the "Agent") pursuant to 28 U.S.C. § 156(c). The Local

Rules require that the debtor retain a noticing agent on the first day of a chapter 11 case or within

seven (7) days thereafter in all cases with more than 200 creditors. Del. Bankr. L.R. 2002-1(f).

Although the Debtors have not filed their schedules of assets and liabilities, they anticipate that

there will be in excess of 200 creditors. Upon information and belief, the Agent is experienced

frequently used as a claims and noticing agent in chapter 11 cases. I believe that the Agent is

well qualified to serve in these Chapter 11 Cases, and its engagement and employment will

provide the Debtors with efficient management of the claims and noticing and related

administrative processes in these Chapter 11 Cases, thereby leaving the Debtors' management

and advisors to focus on the Debtors' chapter 11 efforts. For these reasons, I believe, and the

Debtors submit, that the relief requested in this motion is in the best interests of the Debtors,

their estates and creditors, and should therefore be approved.

(iii)    Debtors' Motion for an Order (I) Approving Continued Use of Cash
Management System, (II) Authorizing Waiver of Certain Bank Account
and Related Requirements of the Office of the United States Trustee for the
District of Delaware, (III) Waiving the Requirements of 11 U.S.C. § 345(b)
on an Interim Basis, and (IV) Granting Administrative Expense
Status of Postpetition Intercompany Claims

44.    By this Motion, the Debtors seek entry of the Proposed Order (i) authorizing and

approving the Debtors' continued use of their Cash Management System, (ii) granting the

Debtors a waiver of certain bank account and related requirements of the United States Trustee

to the extent that such requirements are inconsistent with (a) the Debtors' existing practices

under the Cash Management System or (b) any action taken by the Debtors in accordance with any order granting this Motion or any other order entered in the Debtors' chapter 11 cases, (iii) waiving the requirements of section 345(b) the Bankruptcy Code on an interim basis, and (iv) granting administrative priority status to postpetition intercompany transactions.

45.     As described in the motion, the Debtors maintain a cash management receipt and disbursement system in the ordinary course of their operations.  In order to lessen the disruption generally caused by the commencement of these Chapter 11 Cases and maximize the value of their businesses, assets and chapter 11 estates, it is vital to the Debtors that they maintain their existing Cash Management System.

46.     The Debtors further request that they be authorized to continue to use all correspondence and business forms existing immediately before the Petition Date without (and which do not contain) reference to the Debtors' status as "debtors-in-possession".  Parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors-in-possession given the size of, and publicity surrounding, these Chapter 11 Cases.  If the Debtors were required to change their pre-printed correspondence and business forms, they would be forced to choose standard forms rather than the current forms with which the Debtors' employees, customers, vendors and suppliers are familiar.  Such a change in operations would create a sense of, as well as cause, unsettledness and potential confusion within the Debtors' organization and for the Debtors' employees, customers, vendors and suppliers.  I believe, and the Debtors submit, that it would be costly and disruptive to cease using all existing forms, and to purchase and begin using new stationary and business forms.  The Debtors respectfully submit that to do so would be unnecessary, and that appropriate care can be taken to assure the proper use of the existing forms.

47.    The Debtors also seek a waiver of the U.S. Trustee's requirement that the Debtor's bank accounts be closed and that new post-petition "debtor-in-possession" bank accounts be opened.  If enforced in these Chapter 11 Cases, such requirement would cause enormous disruption to the Debtors' businesses and would seriously impair the Debtors' chapter 11 efforts.  The Debtors' bank accounts are integral to and integrated within a long-established Cash Management System that the Debtors need to preserve and maintain to ensure smooth and effective collections and disbursements in the ordinary course of their businesses.  Therefore, to avoid delays in the Debtors' payment of debts incurred post-petition, and to ensure as smooth a transition as possible into these chapter 11 proceedings, the Debtors should be permitted to preserve and continue to maintain the existing pre-Petition Date bank accounts and, if necessary, to open new accounts and close existing accounts in the normal course of the Debtors' business operations.  Otherwise, resetting the Debtors' various bank accounts is certain to be disruptive, time consuming and expensive.

48.    For these reasons, I believe, and the Debtors submit, that the relief requested in this motion is in the best interests of the Debtors, their estates and creditors, and should therefore be approved.

(iv)    Debtors' Motion for an Order (I) Authorizing the Debtors to (A) Pay Unpaid Wages, Payroll Deductions, and Employee Expense Obligations; (B) Honor Certain of the Debtors' Obligations Under the Earned Bonus Program; (C) Honor Certain of the Debtors' Obligations with Respect to the Severance Plan; (D) Honor Employee Benefits; (E) Pay Workers' Compensation Obligations; (F) Honor Obligations with Respect to the Temporary Placement Agencies; and (G) Make Payments to Third Parties in Connection with the Foregoing; and (II) Authorizing and Directing Applicable Banks and Other Financial Institutions to Process and Pay all Checks Presented for Payment and to Honor all Funds Transfer Requests Made by the Debtors Related to the Foregoing

49.    Pursuant to this motion, the Debtors are seeking authority (but not direction) to (a) pay the Unpaid Wages, Payroll Deductions, and Employee Expense Obligations; (b) honor

certain of the Debtors' obligations under the Earned Bonus Program; (c) honor certain

obligations to the Non-Management Employees under the Debtors' Severance Plan; (d) honor

the Employee Benefits; (e) pay the Workers' Compensation Obligations; (f) honor obligations to

the Temporary Placement Agencies, and (g) make all payments to third parties incident to the

foregoing obligations; and (ii) authorizing and directing applicable banks and other financial

institutions to process and pay all checks presented for payment and to honor all funds transfer

requests made by the Debtors related to the foregoing.  As of the Petition Date, the Debtors

employed approximately 200 full-time and part-time employees in Iowa, North Carolina,

Oklahoma, Colorado, Tennessee, Massachusetts and Ohio.

50.    Based upon the Debtors' ordinary course payroll disbursement schedule, the

aggregate amount of Unpaid Wages, exclusive of Payroll Deductions, as of the Petition Date, is

approximately $245,000.

51.    To the best of my knowledge, information and belief, no Unpaid Wages payable

and proposed to be paid to any single individual Employee, pursuant to this motion, will exceed

the $12,475 priority limitation contained in section 507(a)(4) of the Bankruptcy Code.

52.    The majority of the Employees are reliant upon the timely payment of their wages

and salaries to cover their monthly living costs and expenses.  The Debtors' failure to remit

payment on account of pre-petition Employee claims to the Employees would inflict great

hardship on the Employees and would seriously damage morale and productivity at a very

critical time for the Debtors.  The full commitment of the Employees is required for the Debtors

to successfully navigate through the bankruptcy process.

53.    In addition, the Debtors deduct from the Employees' paychecks certain amounts

for, without limitation, (a) medical and child care spending amounts, (b) contributions to health

savings and flexible spending accounts, (c) 401(k) contributions, (d) amounts to repay 401(k)

loans, and (e) amounts for additional personal and dependent life insurance programs

(collectively, the "Employee Withholdings"). In addition, the Debtors deduct taxes, such as

payroll and social security taxes, required to be withheld by certain federal, state, and local

taxing authorities (collectively, the "Payroll Taxes," and collectively with the Employee

Withholdings, the "Payroll Deductions"). The Debtors forward these withheld amounts, as well

as the Debtors' necessary employer contributions, directly to the appropriate governmental

authorities. The Debtors request authorization to pay all outstanding withholding taxes, tax

deposits and processing fees that accrued and were owed to the taxing authorities prior to the

Petition Date. In addition, the Debtors seek authorization to pay all federal, state and local

withholding taxes, tax deposits and processing fees in the ordinary course of business on a going

forward basis.

54.    In an effort to further incentivize the Employees to achieve higher performance

levels and to retain their workforce, prior to the Petition Date, the Debtors instituted an Earned

Bonus Program as more fully described in the motion. Although the amounts earned by the

Employees pursuant to the Earned Bonus Program are *de minimis* from the point of view of the

Debtors, they are heavily relied upon by the Employees as part of their overall compensation

from the Debtors. Accordingly, by this motion, the Debtors seek authority to honor, in the

ordinary course of their business, their obligations under the Earned Bonus Program, except with

respect to those Employees who qualify as insiders, as that term is defined in the Bankruptcy

Code.

55.    The Debtors have also implemented the Severance Plan in an effort to retain their

valuable workforce through the Proposed Sale. For the reasons set forth in the motion, the

Debtors request the Court to enter the Proposed Severance Order, after an appropriate notice period and if no timely objections are raised, without the need for a further hearing, or if timely objections are raised, after such objections are heard by the Court, authorizing the Debtors to honor, in the ordinary course of their business, the Severance Obligations.

56.     Furthermore, certain Employees are eligible for paid vacation.  Pursuant to the Debtors' procedures and policies, certain Employees are entitled to earn vacation based upon years of service.  Pursuant to the Debtor's policies and procedures, there are a maximum number of hours of vacation that an Employee can accrue.  Additionally, certain Employees are eligible for (a) holiday pay for designated holidays and (b) sick time, which is based upon number of hours worked per week and full or part-time status.

57.     Accordingly, the Debtors request authority, but not direction, from this Court to allow Employees to use pre-petition accrued vacation, sick and holiday time in the ordinary course.  The Employees may not cash-out unpaid vacation, sick or holiday time except upon termination and in accordance with the Debtors' pre-petition policies and procedures.  Also, the Debtors request authority to continue to accrue vacation obligations and award holidays and sick days to eligible Employees for post-petition periods in accordance with the Debtors' pre-petition policies and procedures.

58.     From time to time the Debtors supplement their staffing needs by retaining Temporary Employees pursuant to agreements with Temporary Placement Agencies.  In order to efficiently and effectively operate their business, it is essential for the Debtors to be able to utilize the Temporary Employees in corporate and administrative roles in the accounting and financial areas, among others, on an as needed basis.  Accordingly, any disruption to the Debtors' ability to utilize the Temporary Employees during these Chapter 11 Cases would impair

the Debtors' efforts to optimize the performance of their business at this critical time. In connection with the Debtors' agreements with the Temporary Placement Agencies, the Debtors are required to pay the Temporary Placement Agencies certain fees for their services, as well as pay to the Temporary Placement Agencies those amounts due to the Temporary Employees (collectively, the "Temporary Placement Fees").

59.    Accordingly, by this motion, the Debtors seek authority, but not direction, to continue to pay the Temporary Placement Fees, including, without limitation, any prepetition obligations related thereto, and to contract with the Temporary Placement Agencies in the ordinary course of the Debtors' business

60.    The Debtors have also established various plans and policies to provide the Employees with medical, dental, vision, prescription drug, long-term and short-term disability, workers' compensation, life insurance, flex spending accounts, a 401(k) plan, and other benefits (collectively, the "Employee Benefits," and any amounts owed under these plans, collectively, the "Employee Benefit Obligations"). For the reasons set forth in the motion, the Debtors seek the authority, but not the direction, to have the Debtors satisfy all outstanding amounts related to Employee Benefit Obligations that arose prior to the Petition Date, including, without limitation, premiums and fees owed for administrative costs and other amounts required in connection with the Employee Benefit Obligations, as such amounts become due in the ordinary course of business.

61.    Based upon the foregoing, I believe that there is ample justification for the relief requested and entry of the proposed orders is in the best interests of the Debtors, their estates and creditors.

(v)    Debtors' Motion for the Entry of an Order, Pursuant to Sections 105(a), 363(b), 1107(a) and 1108 of the Bankruptcy Code, Authorizing, but not Directing, the Debtors to Honor Prepetition Obligations to Feed Component Providers, <u>Finishing Farms, and Feed Providers</u>

62.    By this motion, the Debtors seek entry of an order authorizing the Debtors to honor certain obligations related to the farrowing process.  As part of the Debtors' business operations and as more fully described in the motion, the Debtors maintain ten (10) sow farms in North Carolina, Oklahoma and Colorado (collectively, the "<u>Farrowing Production Units</u>"), with approximately 30,000 sows in the aggregate.  Through the Debtors' two (2) feeding mills located in North Carolina and Colorado, the Debtors produce their own finished feed products for use in the Farrowing Production Units, and the feed production components (e.g., corn and soybean meal) used by the Debtors to produce this feed are purchased under short-term arrangements with third-party vendors (collectively, the "<u>Feed Component Providers</u>").  As of the Petition Date, the Debtors estimate that the aggregate outstanding amount due to the Feed Component Providers is approximately $300,000 (collectively, the "<u>Feed Component Provider Obligations</u>").

63.    As described above and in the motion, the hogs are finished at the Finishing Farms in accordance with the terms and conditions of separate agreements by one of the Debtors' approximately 200 independent contractors known as "contract growers" (collectively, the "<u>Contract Growers</u>").  The Debtors procure the necessary feed for the Finishing Farms through eight (8) toll mills located in Iowa (collectively, the "<u>Feed Providers</u>").  As of the Petition Date, the Debtors estimate that they owe the Contract Growers approximately $350,000 (collectively, the "<u>Finishing Farm Obligations</u>") in connection with the Finishing Farms.  In addition, the Debtors estimate that they owe the Feed Providers approximately $1,800,000 (collectively, the "<u>Feed Provider Obligations</u>", together with the Feed Component Provider Obligations and the Finishing Farm Obligations, collectively, the "<u>Obligations</u>").

64.    The Debtors' business operations rely heavily on their highly dependable and extensive network of Finishing Farms. Because the Finishing Farms are solely responsible for the Debtors' finishing operations and the Feed Providers are solely responsible for providing the necessary feed for such operations, if the Finishing Farms or the Feed Providers were to stop providing to the Debtors finishing services or the associated feed, the Debtors' operations would come to a grinding halt, thereby jeopardizing their efforts to preserve and maximize estate value through these chapter 11 cases. As a result, it is imperative that the Debtors be authorized to honor the Finishing Farm Obligations, as well as the Feed Provider Obligations, in the ordinary course of their business, to avoid any interruption to their operations. Because the Debtors rely solely on the Finishing Farms for purposes of the Debtors' finishing operations, the Finishing Farms possess a significant number of the Debtors' pigs as of the Petition Date, as the Debtors have more than approximately 550,000 hogs in wean to finishing production at any point throughout the year. Absent this Court's approval of the relief requested in this motion, the future for, and the Debtors' ability to realize value from, these pigs will be uncertain, to the detriment of estate creditors.

65.    The Debtors also submit that finding alternative providers to meet their operational needs is simply not feasible because, among other things, the Finishing Farms have been strategically located relative to other swine populations, carefully selected to ensure that building design and equipment installation meet the Debtors' specifications, and scientifically designed and electrically monitored to ensure proper climate and ventilation, all in an effort to ensure that the Debtors produce the highest quality hogs. Relocating the pigs to a new space would be disruptive and expensive, have a negative health impact on the pigs due to the stress of moving, and have a negative economic impact on the Debtors' operations given the increased

rate of death for the pigs, the costs of treating resulting health issues, and the significant shipping expenses associated with moving the pigs. In addition, the Debtors believe that the supply of available finishing farm spaces in Iowa is low and insufficient to meet their volume requirements, and any spaces that are presently occupied would require an approximately 6-month exit time frame to free up.

66.     Just as the Finishing Farms and the Feed Providers are critical to the Debtors' finishing operations, the Feed Component Providers are essential to the Debtors' operation of their Farrowing Production Units. Although the Debtors produce their own finished feed products for these units, the Debtors require a continued and uninterrupted supply of the necessary feed components in order to do so, which supply the Debtors presently obtain from the Feed Component Providers. Should the Feed Component Providers stop providing the necessary components to the Debtors, the Debtors' feed mills and, consequently, their farrowing operations would cease to operate, thereby placing the Debtors' chapter 11 efforts at risk.

67.     Similarly, the Debtors have carefully selected the Feed Component Providers and the Feed Providers to ensure that only the highest quality feed is provided to the Debtors' pigs. The Debtors and the Feed Providers work actively together to customize and manage the nutritional content of the feed; thus, it is simply not feasible to change vendors quickly without negatively impacting the Debtors' nutritional program. Furthermore, the Debtors' rations are unique, and many feed providers do not have the ingredient availability necessary to fulfill such rations, let alone the Debtors' volume requirements. In addition, the Feed Providers deliver the feed directly to the Finishing Farms, a service that is not offered by many similar providers. Finally, the Feed Component Providers are located close to the Debtors' feed mills, which are located in remote areas, and the Debtors' options for finding alternative providers in close

proximity to the mills are limited, and using alternative providers further away would increase transportation costs significantly.

68.     The Feed Component Providers, the Finishing Farms, and the Feed Providers are vital to the Debtors' continuing business operations and efforts to preserve and maximize estate value.  After careful consideration, the Debtors have concluded, in an exercise of their sound business judgment, that there is a significant risk that these parties will stop doing business with the Debtors and/or face severe financial hardship if the Debtors do not honor the Obligations, either of which would cause irreparable harm to the Debtors' operations including, but not limited to risking death or illness to the Debtors' hogs.

69.     For these reasons, I believe, and the Debtors submit, that the relief requested in this motion is in the best interests of the Debtors, their estate and creditors, and should therefore be approved.

    (vi)     Debtors' Motion for Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) and (c) Authorizing the Payment of Pre-Petition Claims of Shippers

70.     By this motion, the Debtors seek entry of an order authorizing them to pay, in their discretion, the Shipping Claims in connection with the Debtors' business operations.  The Debtors rely upon the Shippers and the distribution system described in the motion, to transport Debtors' hogs, feed and feed components.  The transportation charges involved amount to a small portion of the value those services impart to the Debtors, but if the Debtors are unable to pay shipping invoices timely, the potential cost will likely greatly exceed the amount of the outstanding invoices.  Indeed, even if the Shippers do not have valid liens under applicable non-bankruptcy law, possession and retention of, or control over, the feed and hogs, and any attendant delay in delivery or shipment, will severely disrupt the Debtors' operations, including,

but limited to, negatively impacting the health of the pigs and even causing death should vital shipments fail to be delivered.

71.     The Debtors firmly believe that the (i) continuation of their positive relationships with the Shippers is imperative to the Debtors' continued business operations and efforts in these Chapter 11 Cases and (ii) payment of the Shipping Claims is essential to preserve and maximize the value of the Debtors' estates.  Payment of the Shipping Claims is necessary and appropriate here because the failure to satisfy the Shipping Claims could have a material adverse effect on the Debtors' day-to-day business operations and relationships with their main customer, Hormel, and vendors, as well as their efforts in these Chapter 11 Cases.

72.     For these reasons, I believe, and the Debtors submit, that the relief requested in this motion is in the best interests of the Debtors, their estates and creditors, and should therefore be approved.

(vii)    Debtors' Motion for an Order Pursuant to Section 366 of the Bankruptcy Code (I) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Payment, (III) Establishing Procedures for Determining Adequate Assurance of Payment, and (IV) Setting a Final Hearing Related Thereto

73.     In the ordinary course of business, the Debtors regularly incur expenses for water, gas, electricity, sewer, waste services, phone and internet services, wi-fi services, satellite services and other similar services (collectively, the "Utility Services") provided by approximately forty-three (43) service providers (collectively, the "Utility Providers") in the aggregate.  By this motion, and to ensure the continuation of the Utility Services to the Debtors' various facilities, the Debtors seek entry of an order prohibiting the Utility Providers from terminating services on account of pre-petition invoices, deeming the Utility Providers

adequately assured of future payment and establishing procedures for determining additional adequate assurance.

74.    On a weekly basis, the Debtors pay amounts on account of bills received from the Utility Providers.  The Debtors have historically paid bills for Utility Services on a timely basis pursuant to the terms contracted for with each Utility Provider. Accordingly, as of the Petition Date, the Debtors believe that they were current on their payments to the Utility Providers.  As of the Petition Date, however, the Debtors may have:  (i) pre-petition accounts payable to certain Utility Providers on account of bills which are not yet due; (ii) outstanding checks issued to certain Utility Providers in payment for pre-petition charges for Utility Services that had not cleared the Debtors' bank account prior to the Petition Date; or (iii) liabilities for pre-petition Utility Services for which the Debtors have not been billed.

75.    The Debtors request that the Court enter an interim order and a final order (together, the "Utility Orders"):  (i) prohibiting the Utility Providers from altering, refusing, or discontinuing services; (ii) approving the Debtors' establishment of a segregated deposit account in the amount of $75,500 to serve as adequate assurance of payment, as the term is defined in section 366(c)(1)(A) of the Bankruptcy Code, for the Utility Providers and deeming the Utility Providers to have received adequate assurance of payment pursuant to section 366(b) of the Bankruptcy Code; (iii) establishing procedures and mechanisms under which the Utility Providers may request additional adequate assurance of future payment; and (iv) authorizing the Debtors to supplement, as necessary, the Utility Service List and providing that any newly added Utility Provider will be subject to the terms of the Utility Orders.

76.    Such relief is necessary to enable the Debtors to continue their business operations uninterrupted by threats of potential termination of, or suspension or interruption in

their utility services.  Because the Utility Providers administer essential services to the Debtors'

facilities, any interruption in utility services could be devastating.  In fact, the temporary or

permanent discontinuation of utility services at any of the Debtors' facilities could irreparably

disrupt the Debtors' business operations and, as a result, fundamentally undermine the Debtors'

reorganization efforts.

     77.    For these reasons, I believe, and the Debtors submit, that the relief requested in

this motion is in the best interests of the Debtors, their creditors, and their estates, and should

therefore be approved.

> (xiii)   Debtors' Motion for Order Pursuant to 11 U.S.C. §§ 105(a), 363, 364, 1107(a),
> and 1108:  (I) Authorizing the Debtors to (A) Continue Pre-Petition Insurance
> Coverage and Enter into New Insurance Policies and (B) Maintain Pre-Petition
> Premium Financing Agreement and Enter into New Post-Petition Premium
> Financing Agreements; and (II) Authorizing and Directing the Debtors' Banks
> and Other Financial Institutions to Process, Honor, and Pay Certain Checks and
> Fund Transfer Requests

    78.    In the ordinary course of the Debtors' businesses, the Debtors maintain, certain

insurance policies (collectively, the "Policies") that provide primary coverage and in certain

instances excess and umbrella coverage for, among other things, workers' compensation,

automobile liability, directors' and officers' liability, general liability, farm and ranch liability,

equipment breakdown, and property.  The Policies are essential to the preservation of the

Debtors' business, properties, and assets, and in many cases the coverage is required by various

regulations, laws, and contracts that govern the Debtors' business conduct.  The Debtors, in their

business judgment, determined that it is not economically advantageous for the Debtors to pay

the premiums on all of their Policies on an annualized basis.  Accordingly, the Debtors are

financing some of the Policies (collectively, the "Financed Policies"), pursuant to two premium

finance agreement (the "Finance Agreements"), namely, the finance agreement with IPFS

Corporation ("IPFS" and the "IPFS Finance Agreement") and the finance agreement with BankDirect Capital Finance ("BankDirect" and the "BankDirect Finance Agreement"). The next monthly installment payments under the Finance Agreements are due within the first twenty-one days of the Petition Date. Accordingly, the Debtors seek authority to make those payments and to honor all subsequent obligations under the Financed Policies as they become due.

79.    The Debtors also have several Policies that are not financed with insurance premium financiers (the "Non-Financed Insurance Policies"), which provide coverage for exporter's liability, inland marine liability, and management liability. In connection with the Non-Financed Insurance Policies, the Debtors are required to pay premiums based upon a fixed rate established and billed by each insurance carrier annually. Annual insurance premiums for the Non-Financed Insurance Policies (the "Insurance Premiums") are paid by the Debtors in advance in lump sum payments. There are no amounts owing for the Non-Financed Insurance Policies.

80.    The Debtors believe that they are current with respect to the financial obligations under the Non-Financed Insurance Policies, including fees paid to the insurance brokers. However, out of an abundance of caution, and in order to prevent any interruption of insurance coverage under the Debtors' Non-Financed Insurance Policies and any attendant harm to the Debtors' businesses that such interruption would cause, the Debtors seek authorization to make, in their discretion, any necessary prepetition Insurance Premium payments and to perform any other prepetition obligations that may be necessary to maintain the Insurance Policies.

81.    The Debtors expect to renew many of their Policies and the Finance Agreements prior to their expiration and/or enter into new premium finance agreements in the ordinary course of their business. Although the Debtors believe that they are authorized to take these actions

pursuant to section 363(c)(1) of the Bankruptcy Code, out of an abundance of caution, the

Debtors seek authority to renew the Policies and/or the Finance Agreements and/or to execute a

new premium finance agreements.

82.    The Policies are essential to the preservation of the Debtors' businesses,

properties, and assets, and in many cases the coverage is required in this District and by other

various regulations, laws, and contracts that govern the Debtors' business conduct.  In view of

the importance of maintaining the insurance coverage with respect to their business activities and

the preservation of the Debtors' cash flow by financing their insurance premiums, the Debtors

believe it is in the best interest of the creditors in these Chapter 11 Cases for the Court to

authorize the Debtors to honor their obligations under the Agreements.  Absent this authority, the

Debtors will be burdened with seeking replacement insurance on an expedited basis or suffering

the risk of a lapse in coverage, either of which would be severely detrimental to the Debtors'

chapter 11 efforts.

83.    For these reasons, I believe, and the Debtors submit, that the relief requested in

this motion is in the best interests of the Debtors, their estates and creditors, and should therefore

be approved.

(ix)    Debtors' Motion Pursuant to Sections 105(a), 361, 362, 363, 507 and 552 of the
        Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014 for Entry of
        Interim and Final Orders (A) Authorizing Use of Cash Collateral (B) Granting
        Adequate Protection; and (C) Scheduling a Final Hearing on the Motion

84.    Prior to the Petition Date, the Debtors began to negotiate with Farm Credit for

usage of cash collateral during these Chapter 11 Cases.  The Debtors and Farm Credit have

negotiated for the consensual usage of Farm Credit's Cash Collateral under the Farm Credit Loan

Agreement, the principle terms of which are embodied in the Interim Order.  Under the terms of

the Interim Order, the Debtors are entitled to use the Cash Collateral, subject to the Budget,

through the earlier of (i) September 30, 2013, at 11:59 p.m. (Eastern time), or (ii) regardless of whether the Debtors have expended the entire amount set forth in the Budget, the failure by the Debtors to comply with any provision of the Interim Order or the Final Order, which failure is not remedied within three (3) business days after such failure. As adequate protection for the usage of Cash Collateral, the Debtors will grant (i) Replacement Liens to Farm Credit on all property and assets of the Debtors, and all proceeds, rents or profits thereof that were either subject to the Prepetition Liens or acquired as a result of the Debtors' use and/or expenditure of the Cash Collateral, (ii) a priority claim to the fullest extent permitted under section 507(b) of the Bankruptcy Code, and a waiver of any section 506(c) claim (subject to entry of the Final Order).

85. The Debtors believe that unless the Debtors have access to the Cash Collateral, the value of Farm Credit's collateral will be seriously diminished. Simply stated, without the use of the Cash Collateral as requested by this motion, the Debtors will suffer immediate and irreparable harm, their business operations will cease and the operational value of the business will not be realized.

86. Therefore, I believe and the Debtors respectfully submit that the use of the Cash Collateral on the terms set forth in the attached proposed Interim Order provides the Lenders with adequate protection and is in the best interest of the Debtors, their estates and creditors and all other parties in interest and therefore should be authorized by this Court.

**f.    Conclusion**

87. In conclusion, for all the foregoing reasons and the reasons as more fully set forth in each of the First Day Pleadings, I respectfully request that each of the First Day Pleadings be granted in its entirety, together with such other and further relief as the Court may deem appropriate.

I certify under penalty of perjury that the foregoing is true and correct based upon my

knowledge, information and belief as set forth in this Declaration.

Date:  July 15 , 2013

_____
Keith A. Maib
Chief Restructuring Officer of AgFeed Industries, Inc. and
AgFeed USA, LLC and its affiliated Debtors

01:13716243.5

# EXHIBIT A

Corporate Organizational Chart

01:13716243.7

