<pre>
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3   IN RE:                         )   Case No. 13-11761(BLS)
                                    )   Chapter 11
 4   AGFEED USA, LLC, et al.        )
                                    )   Courtroom No. 1
 5            Debtors.              )   824 Market Street
                                    )   Wilmington, Delaware 19801
 6                                  )
                                    )   August 29, 2013
 7                                  )   1:30 P.M.

 8                         TRANSCRIPT OF HEARING
               BEFORE HONORABLE BRENDAN L. SHANNON
 9               UNITED STATES BANKRUPTCY JUDGE

10   APPEARANCES:

11   For the Debtors:         Young Conaway Stargatt & Taylor, LLP
                              By:  ROBERT BRADY, ESQ.
12                            1000 N. King Street
                              Rodney Square
13                            Wilmington, Delaware 19801
                              (302) 571-6600
14

15   For U. S. Trustee:       Office of the United States Trustee
                              By:  DAVID BUCHBINDER, ESQ.
16                            844 King Street, Suite 2207
                              Lockbox 35
17                            Wilmington, Delaware  19801
                              (302) 573-6491
18

19   ECRO:                    Dana Moore

20   Transcription Service:   Reliable
                              1007 N. Orange Street
21                            Wilmington, Delaware 19801
                              Telephone:  (302) 654-8080
22                            E-Mail:  gmatthews@reliable-co.com

23

24   Proceedings recorded by electronic sound recording:
     transcript produced by transcription service.
25
</pre>

```
1   For the Committee:          Lowenstein Sandler LLP
                                By:  TIMOTHY WHEELER, ESQ.
2                               1251 Avenue of the Americas
                                New York, New York 10020
3                               (302) 262-6700

4   For Ad Hoc                  Elliott Greenleaf
    Committee of Equity         By:  RAFAEL ZAHRALDDIN, ESQ.
5   Security                    1105 Market Street, Suite 1700
                                Wilmington, Delaware 19801
6                               (302) 384-9400

7   For Cohoma Pork LLC,        Ferry Joseph & Pearce, P.A.
    High Plains Pork LLC,       By:  THEODORE TACCONELLI, ESQ.
8   Murphy-Brown LLC:           824 N. Market Street, #1000
                                Wilmington, Delaware 19801
9                               (302) 575-1555

10  For Farm Credit             Blank Rome LLP
    Services of America PCA,    By:  REGINA STANGO KELBON, ESQ.
11  Farm Credit Services of     1201 North Market Street
    America FLCA:               Wilmington, Delaware 19801
12                              (302) 552-2800

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                               INDEX

2                                                          Page

NOTICE OF AGENDA MATTERS:
3  For the Debtors, by Mr. Brady              4,9,26,29,38
   For the U.S. Trustee, by Mr. Buchbinder            7,32
4  For Boston Committee, by Mr. Wheeler            8,33,43
   For Cohoma Pork LLC, High Plains Pork LLC &
5  Murphy-Brown LLC, by Mr. Tacconelli                  22
   For Farm Credit Services of America, by Ms. Kelbon   28,43
6  For Ad Hoc Committee, by Mr. Zahralddin       32,33,42

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      THE COURT:  Where's the pig?  Please be seated.

2      MR. BRADY:  Couldn't get past security, Your Honor.

3      THE COURT:  That's your tax dollar at work then.

4      MR. BRADY:  Good afternoon, Your Honor, Robert Brady

5  on behalf of AgFeed USA LLC *et al.*

6      THE COURT:  Okay.

7      MR. BRADY:  Your Honor, referring to the amended

8  agenda which was filed this morning which has a number of new

9  matters or new items added to the agenda.  I think for

10  purposes of today we are largely resolved on the sale issues.

11  I think there is going to be some reservation of rights in

12  connection with cash collateral issues.  And as Your Honor

13  saw from the agenda we are coming back on the Daignault

14  incentive program with a revised metric that we would like to

15  supplement the record on and present that to Your Honor.

16      THE COURT:  Sure.

17      MR. BRADY:  It may make sense to start there for two

18  reasons; one, the order indicates if approved Mr. Daignault

19  would receive his payment under the sale order.

20      THE COURT:  Okay.

21      MR. BRADY:  And two, the sale order blackline got

22  over here a little late so this will give people who aren't

23  as interested in the Daignault an opportunity to review that.

24      THE COURT:  An opportunity to review that.  Okay,

25  that's fine.  You may proceed.

1    MR. BRADY:  Your Honor, I will proffer the testimony

2  of Mr. Keith Maib.  This will be a supplement to the proffer

3  made in connection with the KEIP last week.

4    THE COURT:  Very good.

5    MR. BRADY:  So present in the Courtroom today and

6  prepared to testimony in further support of the Debtors'

7  request for approval of a revised Daignault KEIP agreement is

8  Mr. Keith Maib the Debtors CRO.  This will supplement Mr.

9  Maib's proffered testimony from the hearing held on August

10  21st, 2013.

11    THE COURT:  Very good, so noted.

12    MR. BRADY:  Following the hearing on August 21st,

13  2013 Mr. Maib considered the Court's ruling and comments on

14  the record in denying that portion of the Daignault KEIP

15  agreement as it relates to an AgFeed USA sale event.  Based

16  on those comments and after further review of the working

17  capital adjustment and other closing conditions,

18  representations and warranties in the Maschhoff APA, Mr. Maib

19  and Mr. Daignault reached agreement on a revised metric

20  requiring that an AgFeed USA sale event -- I'm sorry, that

21  requiring that AgFeed USA the estate receive at least $65

22  million in value upon an AgFeed sale event in order for Mr.

23  Daignault to earn his incentive compensation payment of

24  $125,000.

25    This agreement was reached between the Debtors and

1  Mr. Daignault on August 22nd, 2013 before the bid deadline for

2  qualifying bids as extended and before the Debtors received a

3  qualifying bid.

4        The Debtors attempted to inform the U.S. Trustee of

5  the revised metric on August 23rd, but were unsuccessful;

6  however, the Debtors did discuss with the United States

7  Trustee on August 26th the revised metric.  And that

8  discussion was in advance of the auction.

9        THE COURT:  Okay.

10       MR. BRADY:  Debtors' counsel also discussed the

11  revised metric with counsel to the Official Committee of

12  Unsecured Creditors before the auction commenced.

13       Mr. Maib would testify that the revised metric of at

14  $65 million dollars in value was determined based on the

15  significant risk that the Maschhoff's would assert a working

16  capital adjustment well in excess of the Debtors' estimate.

17  Mr. Maib would further testify that the Debtors determined

18  that a recovery of at $65 million dollars in value was

19  appropriate giving the closing risk inherent in the Maschhoff

20  bid.  Based upon the Debtors' analysis a bid value of at

21  least $65 million dollars would satisfy the Lenders' secured

22  claims and would leave available, additional state assets

23  that would likely provide a recovery to general Unsecured

24  Creditors.

25       Since the working capital adjustment in the

1 Maschhoff APA was based on differences at closing compared to

2 a March 31st, 2013 balance sheet Mr. Daignault's role as

3 managing AgFeed USA's operations would have a direct impact

4 on the calculation of any asserted adjustment.  In addition

5 the Maschhoff APA contained numerous closing conditions where

6 Mr. Daignault's historic knowledge about the company and

7 knowledge of the various jurisdictions in which the Debtor

8 operates would be crucial to timely satisfying those

9 conditions.

10        A failure to satisfy those conditions which include

11 regulatory consents, title and survey issues, health of the

12 herd issues, permits and licensing to name a few, could

13 result in potentially substantial purchase price adjustments

14 or even a failure to close the transaction.

15        Your Honor, based on the foregoing Mr. Maib would

16 request that the Court consider the revised Daignault KEIP

17 agreement as it relates to an AgFeed USA sale event.  And

18 that would close the additional testimony in support of that.

19        THE COURT:  All right, does anyone else wish to be

20 heard with respect to the proposed revised structure and

21 mechanic for a KEIP agreement for Mr. Daignault.  Mr.

22 Buchbinder, good afternoon, sir.

23        MR. BUCHBINDER:   Good afternoon, Your Honor, Dave

24 Buchbinder on behalf of the United States Trustee.  I will

25 confirm that Mr. Brady did reach out to me before the auction

1 and disclosed to me what he has just disclosed to the Court.

2 And I indicated to him that I wanted to know if it had been

3 discussed with the Committee.  And he indicated to me that it

4 had been.  And on that basis I will defer to the Court's

5 discretion.

6       THE COURT:  All right, does anyone else wish to be

7 heard with respect to the change to Mr. Daignault's

8 structure?  Mr. Wheeler, good afternoon.

9       MR. WHEELER:  Good afternoon, Your Honor, Timothy

10 Wheeler Lowenstein Sandler on behalf of the Official

11 Committee of Unsecured Creditors.  Your Honor, I just wanted

12 to state for the record that Mr. Brady did consult with the

13 Committee prior to the beginning of the auction as he stated

14 on the record and that the Committee had no objection.

15       THE COURT:  Very good.

16       MR. WHEELER:  Thank you.

17       THE COURT:  All right, does anyone else wish to be

18 heard with respect to the proposed structure?  Okay, I think

19 based upon my comments from the prior hearing I am prepared

20 to approve and authorize, or consistent with my prior

21 comments, I am prepared to authorize the KEIP payment, the

22 key employee incentive payment for Mr. Daignault.

23       I do note and find that I think that the standard

24 and the metric for payment is now accurately articulated as

25 an incentive that is consistent with the case law that's

1  construed Section 503(c) particularly the Dana case and the

2  whole discussion about the layup.  And at some point I or one

3  of my colleagues may write on this issue because this is a

4  concept that comes up and is a challenge I think for counsel

5  to structure these transactions consistent with the

6  requirements of the real world and the requirements of the

7  code.

8          And I think I was pretty scrupulous in observing

9  that I'm confident that Mr. Daignault was doing everything he

10  could both to achieve a good result and frankly to obtain the

11  substantial payment that he had been promised.  But the

12  structure as originally presented was complicated by the

13  requirements of the code.  And I think that this is a

14  manifestly superior presentation for purposes of compliance

15  with Section 503(c), and therefore, based upon the record

16  before me I would approve and authorize the request.

17          Do you have a form or order?

18          MR. BRADY:  I do, Your Honor.  I think Mr. Bowman

19  stepped out of the room and I believe he has it.

20          THE COURT:  Okay, that's fine.  We'll deal with that

21  in due time.  That motion as presented is granted.  The

22  balance of that relief has already been granted.

23          MR. BRADY:  Actually because of the auction and the

24  timing we never actually got to submit the order so this

25  order will have everything in it.

1          THE COURT:  Okay, that's fine.

2          MR. BRADY:  Your Honor, I think that we can move to

3    the sale, and not to bury the lead, we think it was an

4    incredibly successful sale, 14 hours, 35 rounds of bidding

5    and an increase of value by our calculation of $12 million

6    dollars.

7          So I have a proffer of Mr. Maib I'd like to put on

8    the record.  I have an exhibit I can hand out that shows how

9    the Debtor valued the bid.  You're going to hear the term

10   value more than cash a lot in this, Your Honor.  A decision

11   was made that there was an opportunity here to achieve value.

12   It may not all come in cash all at once and that was better

13   for the estate.  It was better, not only for the USA estate,

14   but for the industries estate.  So we really focused hard on

15   the value calculation in addition to the cash.

16          It's really a credit to the Lenders, Your Honor,

17   because under the Maschhoff deal they were being paid in full

18   at closing.  And as you'll hear this deal requires them to

19   stay in the case a little longer.  We think they'll be paid

20   in full and we think they'll be compensated for staying in

21   the case.  But at the same time we needed their consent to

22   change some of these procedures to get this value.  And they

23   worked with us.  They were very cooperative.  And certainly

24   they reserved their rights, but they let the process play

25   out.  And we think it was a great result for the estate.  So

1    we thank them in advance.

2            If I may hand up the exhibit and hand it out, then

3    I'll walk through the proffer.

4            THE COURT:  Sure.  Does anyone object to proceeding

5    with Mr. Maib's testimony in support of Section 363 relief by

6    way of proffer?  Of course anybody who wishes to cross

7    examine Mr. Maib would have an opportunity to do so at the

8    appropriate time.  You may proceed by proffer.  Thank you.

9            MR. BRADY:  And Your Honor, I'll mark that and seek

10   to admit it at the right time in the proffer.  This is sort

11   of the score card that we used during the auction.

12           But turning to the proffer of Mr. Maib.  Again

13   present in the Courtroom today and prepared to testify in

14   support of the motion to approve a proposed asset purchase

15   agreement between Cohoma Pork, High Plains Pork and Murphy

16   Brown on the one hand, and AgFeed USA LLC and its affiliates

17   on the other hand as Mr. Keith Maib.

18           As we've done in the past, Your Honor, we adopt Mr.

19   Maib's prior declaration in the case and his testimony

20   relating to the bid procedures here approved by the Court on

21   August 1st.  And I think the record is complete as to Mr.

22   Maib's position and his experience in the industry.  I would

23   note I'll keep this proffer, Your Honor, to really the post

24   petition marketing period.

25           THE COURT:  Sure.

1       MR. BRADY:  Substantial testimony on the pre-

2  petition marketing period.

3       THE COURT:  There has been.

4       MR. BRADY:  And as Your Honor indicated we only get

5  so much credit for the prepetition marketing period.  So we

6  will focus on the post petition marketing period in this

7  proffer.

8       Mr. Maib would testify that since the petition date

9  the Debtors through BDA contacted at least 16 potential

10 bidders for the AgFeed USA assets in addition to 10 bidders

11 contacted after exclusivity expired with the Maschhoff's the

12 week prior to the petition date.  Eighteen parties signed

13 non-disclosure agreements and 12 conducted due diligence on

14 the assets.  Ten bidders had direct conversations with either

15 Mr. Maib or BDA on the bidding and auction process.

16      All of these potential bidders were informed that

17 the Debtors would consider lot bids as well as bids for

18 substantially all of the AgFeed USA assets, and that the

19 Debtors would consider bids for assets not included in the

20 Maschhoff APA.

21      Mr. Maib would testify that in accordance with the

22 bid procedures order, and with consent of the Lenders and in

23 consultation with the Unsecured Creditors Committee the bid

24 deadline was extended to August 23rd at 4:00 p.m.  I'm sorry,

25 that actually turned out to be midnight, 11:59 p.m., sorry.

1  He would testify that the Debtors received bids from High

2  Plains Pork, Cohoma Pork and Murphy-Brown, and another bid

3  from Cargill Pork prior to that extended bid deadline.

4         Mr. Maib would testify that the Debtors in

5  consultation with the Unsecured Creditors Committee requested

6  the Lenders consent to additional modifications to the bid

7  procedures that the Debtors believed were consistent with the

8  concept of lot bidding and were potentially necessary to

9  consider the Cohoma/Murphy-Brown bid a qualifying bid.  The

10 Lenders granted their consent to the proposed modifications,

11 but reserved all rights with respect to the bid and the

12 process.

13        On August 23rd, 2013 the Debtors were notified at

14 approximately 5:00 p.m. that the Office of the United States

15 Trustee had appointed an Official Committee of Equity

16 Security Holders.  And later that evening the Equity

17 Committee retained advisors.

18        The Debtors worked throughout the weekend to

19 negotiate a confidentiality agreement and provide the Equity

20 Committee and its advisors with the information necessary to

21 get up to speed on the AgFeed USA sale process.  The Debtors

22 consulted with the Equity Committee throughout the auction

23 process as soon as an appropriate confidentiality agreement

24 was negotiated and had two teleconferences on Sunday, August

25 25th, 2013 with Equity Committee advisors and meetings

1 throughout the day on Monday, August 26th, 2013 the day of the

2 auction.

3       Mr. Maib would testify that pursuant to the bidding

4 procedures order on August 24th the Debtors in consultation

5 with the Lenders and the Unsecured Creditors Committee

6 designated Cohoma/Murphy-Brown bid as a qualifying bid.  And

7 later that night the Debtors again in consultation with the

8 Lenders and the Unsecured Creditors Committee selected the

9 Cohoma/Murphy-Brown bid as the baseline auction bid as that

10 term has defined, basically the highest and best bid received

11 to that point.

12       The Debtors provided both qualifying bidders, the

13 Lenders and both Official Committees with a spread sheet

14 outlining how the Debtors valued both qualifying bids.  Mr.

15 Maib would testify that pursuant to the bid procedures order

16 an auction was convened at the offices of Young Conaway in

17 Wilmington, Delaware on August 23rd, 2013 at 10:00 a.m.

18       For purposes of the auction representatives and/or

19 professionals on behalf of the Debtors including an

20 independent director of the board of AgFeed Industries Inc.,

21 the Maschhoff's, the Cohoma/Murphy-Brown, the Unsecured

22 Creditors Committee, the Equity Committee and the Lenders

23 were all present at the auction.  The auction was very

24 robust.  It lasted nearly 14 hours and involved 35 rounds of

25 bidding.

1    Throughout the process the Debtors met with the
2  bidders, answered questions, provided information on how the
3  Debtors valued bids, consulted with the Lenders and both
4  Official Committees.  At the close of the auction the Debtors
5  in consultation with the Lenders, both Official Committees
6  and the board of directors of AgFeed Industries Inc.,
7  declared that the Cohoma/Murphy-Brown bid valued at
8  $79,228,406 under the Debtors bid equalization model as the
9  prevailing bid.  And the last bid of the Maschhoff's valued
10 at $78,978,405 under the Debtors bid equalization model as
11 the second highest bid pursuant to the bid procedures order.
12    Mr. Maib would summarize the Cohoma/Murphy-Brown bid
13 as follows and would seek to mark as Debtors #1 the hand out
14 entitled AgFeed USA LLC auction results marked as #1 for
15 identification.
16    Turning to that, Your Honor, you'll see the initial
17 valuation of the stalking horse bid.  Again this was the
18 Debtors valuation.
19    THE COURT:  Right.
20    MR. BRADY:  And was not, one of the concerns
21 throughout was it had a working capital adjustment.  There
22 was simply no way to know what it would be.  We had a view
23 and we were sure the Maschhoff's had a view.  We just didn't
24 know their view.
25    THE COURT:  My recollection, and I have looked at my

1  notes, my recollection is that the mechanic or the working

2  capital adjustment was predicated upon two different points

3  in time; one about six months ago and one whenever this thing

4  was going to close, and second that it was a potentially, I

5  mean again I make no comment about the merits of it, but it

6  wasn't necessarily something that was subject to a nominal

7  cap or something else.  The testimony reflected that it

8  presented the prospect of real money.

9       MR. BRADY:  Exactly, Your Honor.  It was based on a

10  March 31st balance sheet and then you would look at the

11  balance sheet as it existed on the day of the closing.  And

12  any differences that were in the negative would be a deduct

13  from the purchase price.  And there was no cap.

14       So, Your Honor, we believe then that we started with

15  a Maschhoff bid that was valued a little over $67 million

16  dollars.  We then received the qualifying bid from Cohoma

17  Pork, Murphy-Brown and valued that at $69,147,902, and

18  declared that the auction baseline bid.  And that is where we

19  started the auction.

20       You'll then see in the final two columns both a

21  valuation of the Maschhoff bid and what was declared the

22  prevailing bid the Cohoma Pork, High Plains Pork, Murphy-

23  Brown.  Obviously, Your Honor, the first thing you'll notice

24  is the large difference in the cash that would come to the

25  estate initially.

1    The Maschhoff's final bid was all in cash.  The

2  Cohoma/Murphy-Brown bid paid a substantial portion in cash,

3  but left with the Debtors a significant portion of their

4  finishing inventory, the vast majority of which is under

5  contract to be delivered to Hormel under fixed pricing by the

6  end of the year.  And as you see the Debtors value that at

7  over $33 million, nearly $34 million dollars.

8    THE COURT:  Well, just so that I understand the

9  dynamic here, and again I'm not trying to, I just want to

10  make sure that I follow this.  My understanding was the

11  Maschhoff's structure was an all cash bid with a working

12  capital adjustment designed that they were going to step into

13  the company business and run it.  And so they would have

14  picked up those animals as well so they were paying for them,

15  right?

16    MR. BRADY:  Correct.

17    THE COURT:  Okay, I think I understand the

18  difference there.

19    MR. BRADY:  What's happening here, Your Honor, and

20  basically the Cohoma Pork/High Plains Pork is one buyer if

21  you will.  And they were buying Oklahoma and Colorado.

22  Murphy-Brown is buying North Carolina.  Murphy-Brown which is

23  an affiliate of Smithfield wanted the space, but not the

24  hogs.  The hogs are committed to Hormel.  So they've agreed

25  to manage that finishing herd for us and we'll get the

1 receivable from Hormel as they're delivered.  And there were

2 reasons Murphy-Brown wanted to do that, but that's really

3 between them.  But it enabled us to sell the North Carolina

4 Farm, but actually keep the inventory and get the receivable

5 from it which obviously we valued quite high.

6          So that, Your Honor, then minus the breakup fee and

7 expense reimbursement takes this to the estimated net

8 proceeds.  The difference there in the next set of numbers in

9 the other assets available, the Maschhoff's were not taking

10 Oklahoma which the Debtors valued at a potential cash of a

11 million, seven to the estate.  That is really the runoff of

12 Oklahoma minus claims.

13          The risk buyer is taking the operations, but wants

14 the Debtor to reject the lease.  The lessor is actually an

15 affiliate of Cohoma Pork and High Plains Pork.  There is not

16 an identity of interest between those affiliates.  And there

17 were tax issues that led them to that rejected.  They'll then

18 of course enter into a new lease there, but the Debtor had to

19 deduct from this bid the cost of that.  And we use an

20 estimated $2.5 million.  Nothing on here impacts the Debtors

21 rights to argue that claims should be less, but that's what

22 we use as a deduct because that's the maximum we think it

23 could be.

24          THE COURT:  It must have been a heck of an auction.

25          MR. BRADY:  Well, Your Honor, you probably

1  experienced some of these in practice, the actual auction

2  didn't really start till 6:00 p.m. and then it moved quite

3  swiftly.  But from 10:00 to 6:00 --

4          THE COURT:  Was there food?

5          MR. BRADY:  We served pizza and cheese steaks.

6  There was a lot of bacon and a lot of pepperoni on the pizza.

7          So moving down we still have some finishing

8  inventory that they also left us.  That's not committed, but

9  the Debtors believe there is an open market for that.

10         THE COURT:  Okay.

11         MR. BRADY:  We have the cash on the balance sheet.

12 The other asset listed is neither buyer was taking certain

13 pack of receivables and some pre-paid obligations.  So the

14 Debtor pays their growers in advance.  So we'll pay

15 September, but upon closing we'll get the back end of the

16 month back as the buyer picks that up.

17         We then estimated the total un-assumed liabilities.

18 And you may notice that the Maschhoff bid changed

19 dramatically on the un-assumed liabilities.  At one point the

20 Maschhoff's actually adopted the structure of the

21 Cohoma/Murphy-Brown bid and were not taking any liabilities,

22 so they were on an apples to apples basis with the prevailing

23 bidder at that point.  The difference there really, Your

24 Honor, is severance and employee obligations.  The good news

25 about the Cohoma Pork, High Plains Pork and Murphy-Brown bid

1  that you can't really put a price on them, but is very

2  meaningful to the Debtors, and I know to the Court as well,

3  they're going to take a substantial number of the employees.

4          THE COURT:  Okay.

5          MR. BRADY:  And so that was important.  We couldn't

6  put a figure on that for purposes of the auction, but

7  obviously it was something important to the Debtors and we're

8  pleased with that result.  From that you deduct the

9  investment banking fee that's estimated on this transaction

10  and you get the value of $79,228,406.  So that is the auction

11  result, again by our view more than $12 million dollars of

12  value after a very long day.

13          So continuing with the Maib proffer just to close it

14  out Mr. Maib would testify that the auction was conducted in

15  an open, fair and reasonable manner which afforded parties

16  the full opportunity to submit higher and better bids.  He

17  would testify that the negotiations concerning the structures

18  of the bids were conducted in good faith and at arm's length,

19  and that there was no collusion among the parties at which he

20  is aware.  Both qualifying bidders confirmed on the record at

21  the start of the auction that they had not engaged in any

22  collusion, and that is required by the local rules.

23          Mr. Maib would further testify that he believes the

24  sale and auction process incurs competitive bidding provided

25  a market test to ensure that the Debtors maximize the value

1   of its assets.  Mr. Maib would testify that based on his

2   experience, and knowledge and participation in the marketing

3   and sale process under the bid procedures, the Debtors

4   execution of the proposed APA with Cohoma/Murphy-Brown

5   represents an arm's length agreement.  It was entered into in

6   good faith.

7         The proposed purchase price for the AgFeed USA

8   assets represents a fair and reasonable price under the

9   circumstances.  Entry into the APA with Cohoma/Murphy-Brown

10  is an exercise of the Debtors sound business judgment and the

11  sales in the best interest of the Debtors estates and their

12  stakeholders in that it maximizes the value of the Debtors'

13  estates.

14        Cohoma/Murphy-Brown is not affiliated with, nor owns

15  any interest in and is not related in any way to the Debtors

16  other then the fact that an affiliate of Cohoma is a current

17  lessor to the Debtor.  And Cohoma/Murphy-Brown is not an

18  insider of the Debtors as that term is defined in the

19  Bankruptcy Code.

20        That closes the proffer of Mr. Maib.

21        THE COURT:  All right, does anyone wish to cross

22  examine Mr. Maib with respect to the contents of the proffer?

23  Very well, I'll accept the proffer in support of the Debtors'

24  case in connection with the sale motion.

25        MR. BRADY:  Your Honor, Debtor has no other

1  evidence.  The buyer is present and would like to make a

2  short proffer on adequate assurance of future performance.

3         THE COURT:  Very good.  Mr. Tacconelli, good to see

4  you.

5         MR. TACCONELLI:  May I please the Court, Theodore

6  Tacconelli, local counsel for Cohoma Pork LLC and High Plains

7  Pork LLC.  I am also here doing double duty for Murphy-Brown

8  LLC.  And Jason Harbour of the Hunton & Williams Firm is on

9  the phone, Your Honor.

10         THE COURT:  Okay, very good.

11         MR. TACCONELLI:  Your Honor, I would like to make

12  two proffers; one first for Cohoma Pork LLC and High Plains

13  LLC.  On the phone today is Dennis Breder, B-r-e-d-e-r.

14  First, Your Honor, I would like to state for the record that

15  we're not aware of any objections to the adequate assurance

16  of future performance under the agreements.

17         THE COURT:  Okay.

18         MR. TACCONELLI:  And this is for the benefit of the

19  Court.  Mr. Breder is the CFO of Cohoma Pork, which I'll

20  refer to as Cohoma, and High Plains Pork which I will refer

21  to as High Plains.  Mr. Breder is fully familiar with the

22  proposed transaction and has been extensively involved in the

23  negotiations of the asset purchase agreement among the

24  Debtors, Murphy-Brown, Cohoma and High Plains in preparations

25  for its closing.

1        In brief summary Cohoma and High Plains will have

2   sufficient capital and access to financing to meet their

3   obligations under the executory contracts and unexpired

4   leases to be assigned to Cohoma and High Plains.  Both Cohoma

5   and High Plains are wholly owned, direct subsidiaries of

6   Trioak Foods, which I will refer to now as Trioak.

7        Mr. Breder is the CFO of Trioak and has worked for

8   Trioak as the CFO for seven years.  Trioak has been in

9   business since 1961 and in the pork production business for

10  more than 25 years.  Trioak and its subsidiaries operate a

11  livestock production division and a grain merchandising

12  division.  Based on Trioak's audited financial statement for

13  year 2012 Trioak had sales of in excess of $171 million

14  dollars.

15       Trioak formed Cohoma for the purpose of acquiring

16  assets owned by the Debtors in Oklahoma, Colorado and Iowa.

17  And it formed High Plains for the purpose of requiring assets

18  owned by the Debtors in Colorado.  Trioak has modeled the

19  impact of the transaction on the remainder of 2013 in its

20  2013 financial model as well as its forward looking five year

21  model, and has confidence that its financial ratios and

22  balance sheet will remain strong with the added growth and

23  related commitments from the assets to be acquired in the

24  transaction.

25       If the Court approves the proposed transaction

1  including the assignment of the executory contracts and

2  unexpired leases, Cohoma and High Plains intend to comply

3  with the terms of, and perform under the executory contracts

4  and unexpired leases to be assigned to Cohoma and High

5  Plains.  Cohoma and High Plains will have the financial

6  ability to meet the obligations under the executory contracts

7  and unexpired leases to be assigned to them.  And the

8  financial condition of both of them will be substantially

9  better then the financial condition of the Debtors.

10        In addition following the assignment, counter

11  parties to the executory contracts and unexpired leases to be

12  assigned to Cohoma and High Plains would be in a much better

13  position than they would be if the executory contracts and

14  unexpired leases were simply rejected or retained by the

15  Debtors.

16        Your Honor, Mr. Breder is on the phone if Your Honor

17  has any questions.

18        THE COURT:  I have no questions.

19        MR. TACCONELLI:  I will now proceed with the proffer

20  for Murphy-Brown LLC.  On the phone, Your Honor, is Mr. Gregg

21  Schmidt, G-r-e-g-g, S-c-h-m-i-d-t, who if called as a witness

22  would testify as follows.  Mr. Schmidt is currently the

23  president of Murphy-Brown.  Mr. Schmidt has worked for

24  Murphy-Brown or other affiliates of Smithfield Foods since

25  1999.

1    Mr. Schmidt is fully familiar with the proposed

2  transaction and has been extensively involved in the

3  negotiations of the asset purchase agreement among the

4  Debtors, Murphy-Brown, High Plains Pork and Cohoma Pork in

5  preparations for its closing.  In Brief summary Murphy-Brown

6  will have sufficient capital and access to financing to meet

7  the obligations under the executory contracts and unexpired

8  leases to be assigned to Murphy-Brown.

9    Murphy-Brown is a wholly owned indirect subsidiary

10 of Smithfield Foods Inc.  Smithfield Foods Inc., is a $13

11 billion dollar global food company and the world's largest

12 pork producer and hog producer.  For Smithfield's fiscal 2013

13 which ended in April 2013 Smithfield reported sales of $13.2

14 billion.

15    Murphy-Brown is a $3 billion dollar integrated swine

16 production business with approximately 5,000 employees.

17 Murphy-Brown's integrated swine production business includes,

18 without limitation, feed manufacturing and delivery, nursery

19 and finishing farms, most of which are operated pursuant to

20 grower contracts, sow farms and swine transportation

21 including transportation between farms, to market, to

22 Smithfield's facilities and to unaffiliated third parties.

23    If the Court approves the proposed transaction

24 including the assignment of the executory contracts and

25 unexpired leases, Murphy-Brown intends to comply with the

1  terms of and perform under the executory contracts and

2  unexpired leases to be assigned to Murphy-Brown.  Murphy-

3  Brown will have the financial ability to meet the obligations

4  under the executory contracts and unexpired leases to be

5  assigned to Murphy-Brown, and the financial condition of

6  Murphy-Brown will be substantially better then the financial

7  condition of the Debtors.

8           In addition following the assignment, counter

9  parties to the executory contracts and unexpired leases to be

10  assigned to Murphy-Brown would be in a much better position

11  than they would be if the executory contracts and unexpired

12  leases were simply rejected or retained by the Debtors.

13           Your Honor, Mr. Schmidt is on the phone if Your

14  Honor has any questions for him.

15           THE COURT:  I have no questions.

16           MR. TACCONELLI:  That concludes the proffer.

17           THE COURT:  Very good.

18           MR. TACCONELLI:  Thank you.

19           THE COURT:  Thank you.

20           MR. BRADY:  Your Honor, I just want to make a couple

21  additional comments and then I'll sit down and let other

22  people talk.

23           You may have seen the Lenders objection to the sale

24  raising 363(f) consent rights.  Obviously during the auction

25  we understood that the Maschhoff bid would pay them in full

1   and this bid would pay them over time.  Two elements the

2   Lenders requested are really required to consent to the bid

3   that pays them over time.

4            One was some agreement on their pay down.  And so

5   the order has been revised to indicate that the Debtor is

6   going to hold $5 million dollars back.  Everything over that

7   is going to go to the Lender which at a minimum of $48

8   million dollars to pay them down initially.  And then as we

9   receive money in from Hormel for the sale of these finishing

10  inventories we'll continue to pay them down, but we're

11  working on a longer term cash collateral budget.  The cash

12  collateral budget for 40 days just takes us out two weeks.

13           THE COURT:  Sure.

14           MR. BRADY:  The second was a fee, and it has a name.

15           THE COURT:  It always has a name.

16           MR. BRADY:  And Your Honor, we knew about this

17  during the auction.  I mean, you know --

18           THE COURT:  Let me guess line maintenance,

19  accommodation fee, line preservation fee.

20           MR. BRADY:  It's called a risk based capital charge.

21           THE COURT:  [Indiscernible].

22           MR. BRADY:  We knew about this during the auction.

23           THE COURT:  You're staring down, but I'm okay with

24  it.

25           MR. BRADY:  We appreciate this in the sense that the

1  Lender made this clear at the auction.  So we actually

2  included this in our calculation.  We knew in the Maschhoff

3  we wouldn't have to pay it so they got credit.  We knew in a

4  Cohoma bid we would have to pay it most likely if Your Honor

5  approves it.  So it really is a cost of capital charge.

6  　　　　　They were going to get their money on September 6th.

7  Now, they are going to get it at the end of November, maybe a

8  little sooner.  So, their cost of capital is X, their

9  interest rate is Y and this represents the difference in the

10 cost of capital, so, its $330,000.  Again it was a

11 requirement of the Lender for their 363(f) consent.

12 　　　　　THE COURT:  Sure.

13 　　　　　MR. BRADY:  And so we have a blackline.  I'll walk

14 you through some of the other changes and the like, but

15 that's really the major difference.  And I will be quiet now

16 and let others speak.

17 　　　　　THE COURT:  Well, since we've just covered the

18 Lenders why don't I hear from the Lenders first; anything to

19 add, Ms. Kelbon.  Obviously, I'm just busting your chops.

20 　　　　　MS. KELBON:  its okay, Your Honor.  Good afternoon,

21 Your Honor, Regina Stango Kelbon from Blank Rome on behalf of

22 Farm Credit Services of America PCA and Farm Credit Services

23 of America FLCA.  Your Honor, as you know the Lenders did

24 file an objection.  And it did reflect our position in the

25 evening.

1        While the auction was a successful auction for the

2   Debtors and their estates it is not exactly an ideal result

3   for Farm Credit Entities because as Your Honor knows from the

4   very beginning of the case it was not only Farm Credits'

5   expectation, but the Debtors' expectation that Farm Credit

6   would be paid in full by the middle of September and would be

7   out of the case by that point in time; however, to

8   accommodate the Debtors' and their estates' request for a bid

9   that did not include the hogs, but allowed for a potential

10  greater recovery for the estate over time.

11       In the long run Farm Credits' consent is reflected

12  in the marked up order that Mr. Brady will hand up to you.

13  Notwithstanding that, Your Honor, it is our expectation that

14  Farm Credit should be paid out as quickly as possible from

15  the remaining inventory that is sold in the ordinary course.

16  So we will expect to see that in the presented budget for the

17  longer term.  Thank you, Your Honor.

18       THE COURT:  Okay, thank you.  All right, does anyone

19  else wish to be heard with respect to the request?  Okay, do

20  you have a blackline?

21       MR. BRADY:  I do, Your Honor.  We filed a blackline

22  last night and then we have one blackline against the

23  blackline.

24       THE COURT:  I think that's fine because I've seen

25  the prior blackline.  So I would like to see the latest and

1  greatest.

2       MR. BRADY:  Your Honor, the other big change to this

3  is the Maschhoff's indicated that the order didn't contain a

4  requirement to pay their breakup fee and expense

5  reimbursement which obviously we intend to do.  So that was

6  added as paragraph 42.

7       THE COURT:  Okay.

8       MR. BRADY:  On page 31.

9       THE COURT:  That gets paid from proceeds of the

10 closed transaction?

11      MR. BRADY:  Yes, Your Honor.  There may be a little

12 delay on the expense reimbursement and that requires

13 documents.

14      Your Honor, there was another late breaking new

15 story as we got started today.  In the Maschhoff bid they

16 were taking trade avoidance actions.  The Maschhoff's were

17 buying those and then they were not going to pursue them.

18      THE COURT:  Yeah, they didn't want the vendors sued,

19 right.

20      MR. BRADY:  That was not in the Cohoma/Murphy-Brown

21 bid.  The Committee raised that because that was a point they

22 had negotiated with the Maschhoff's to have those avoidance

23 actions purchased and then the Maschhoff's were not going to

24 pursue them.  The buyer here has agreed to do the same thing.

25 So these are trade avoidance actions that the Maschhoff's

1  were going to buy.  And now this buyer is going to buy them

2  as well and then not pursue them.  And we'll have to work

3  that into the documentation.

4        I presume, right now the order says an asset

5  purchase agreement in substantially the form attached.  And

6  that will be a change to the asset purchase agreement we'll

7  make.  I should be clear that no potential avoidance actions

8  against the Lender are being sold as part of this.

9  Obviously, the Lenders are currently under an investigation

10  period with the Committee.  And if the Committee doesn't

11  bring an action they'll get a full release.  And so we're not

12  seeking to sell those because we'll let that process play out

13  here in the estate.

14        And with that, Your Honor, I think those were the

15  primary changes from the blackline last night.  I think there

16  were a couple typos picked up in the like, but I'm not aware

17  of anything else here.  And again the order we have will have

18  an asset purchase agreement in substantially final form.  And

19  there may be some nits made, but the biggest change will be

20  this change to the avoidance action and purchase.

21        THE COURT:  Okay, let me finish the page turn.

22  Okay, I see paragraph 42 with the breakup fee and the expense

23  reimbursement, both of which have been previously approved

24  and their payment would be approved through this order.

25  Okay.

1    MR. BRADY:  One last change, Your Honor.  This is in

2 paragraph 34 on page 28, and we'll have to write this in, and

3 this talks about the Lenders consulting with the Debtors and

4 the purchasers in connection with the post closing adjustment

5 and the closing sheet.

6    The Creditors Committee has asked to be part of that

7 consultation for the estimate closing statement.  So we have

8 agreed and the Lenders have agreed.  And I see Mr. Zahralddin

9 standing up so I'm assuming we're going to add the Equity

10 Committee as well as the Unsecured Creditors Committee to

11 that.

12    THE COURT:  That sounds appropriate.  Mr.

13 Zahralddin, good afternoon.

14    MR. ZAHRALDDIN:  Good afternoon, Your Honor, Rafael

15 Zahralddin for the Official Committee of Equity Security

16 Holders.  I almost didn't need to rise because I think we've

17 resolved that.  As long as we're included we're copacetic.

18    THE COURT:  Very good.

19    MR. ZAHRALDDIN:  Thank you, Your Honor.

20    THE COURT:  All right, does anyone else wish to be

21 heard?  Okay, oh, Mr. Buchbinder.

22    MR. BUCHBINDER:  Your Honor, the U.S. Trustee had

23 filed an objection to the sale based upon the Debtors failure

24 to have filed schedules and sat for a 341 hearing.  The

25 Debtor did file its schedules on Saturday evening August 24th.

1  We have adjourned the 341 hearing from September 3rd to

2  September 11th at 10:00 a.m. based primarily upon very

3  positive auction results.  And we are not withdrawing our

4  objection, but we will consider it resolved.

5        THE COURT:  Okay, thank you.  Mr. Zahralddin.  I did

6  see your Committees' statement in support of the sale.  I

7  appreciate that filing.

8        MR. ZAHRALDDIN:  Yes, Your Honor, and we just wanted

9  to indicate that because this was filed prior to the next

10  item, we'll move our reservation of rights to cash collateral

11  to that discussion if it's even necessary.

12        And our other reservation we just wanted to rise and

13  say that we appreciated Mr. Maib, and Mr. Brady and their

14  team in getting things to us.  And really we only reserved

15  our rights because in the flurry of getting things done we

16  felt that we needed to see everything in there and seal that

17  off.  But we did have a discussion with our Committee and had

18  authority to file the statement in support.  And we're

19  appreciative of their efforts during the auction.

20        THE COURT:  Very good.  Thank you.

21        MR. ZAHRALDDIN:  Thank you, Your Honor.

22        THE COURT:  All right, Mr. Wheeler.

23        MR. WHEELER:  Thank you, Your Honor, Timothy

24  Wheeler, Lowenstein & Sandler on behalf of the Official

25  Committee of Unsecured Creditors.  Your Honor, I just wanted

1  to state for the record that the Committee does support the

2  proposed asset sale to the prevailing bidder.

3         Pursuant to the bidding procedures the Committees'

4  professionals were active participants in, as described, 14

5  hour auction through dozens of bids and a net improvement in

6  the value of approximately $12 million dollars.  At different

7  times throughout the day we interacted with all the other

8  participants.

9          And based upon our observations we've concluded

10 that this robust auction resulted in a prevailing bid that

11 represents the highest and best offer for the Debtors' USA

12 assets, and therefore, we support the proposed asset sale.

13 Thank you.

14        THE COURT:  Thank you; anyone else?  All right, well

15 not surprisingly I'm prepared to grant the motion.  I do

16 find, and I'll get into some detail, but I do find that the

17 Debtors have carried their burden with respect to the request

18 for approval of the sale of assets pursuant to Bankruptcy

19 Code Section 363.

20        Before turning to the specific ruling I would first

21 observe the recent modification to the form of order that

22 addresses the arrangement that's been achieved for Farm

23 Credit.  I appreciate getting clarity from the parties.  I

24 have no issue with it.

25        It certainly makes abundant sense to me, both the

1  payment structure that provides for a minimum of $48 million

2  dollars to go at the closing has been adequately disclosed

3  and I understand that as a use of proceeds with a continuing

4  payment promptly, and the hope and expectation it will be

5  paid off as soon as possible.

6         And then second with respect to the fee I think Mr.

7  Brady accurately characterized it as a cost of capital issue.

8  This would be a very, very different and difficult hearing if

9  we had frankly a Lender complaining about prompt payment

10  versus more money later.  And I'm not certain how that would

11  play out so I think that that was actually an elegant

12  resolution to the issue that at least from the Debtors

13  assessment affords it the opportunity to take advantage of a

14  superior transaction.

15         But clearly from Mr. Maib's proffer as well as the

16  record that's been previously developed in this case, I'm

17  satisfied that the Debtors have carried their burden that the

18  proposed transaction represents the exercise of their

19  reasonable business judgment.  And as well the record here

20  abundantly demonstrates that the proposed transaction is

21  proceeding in good faith and that there is no party that is

22  receiving an unfair or inappropriate benefit in connection

23  with this.

24         There has been adequate disclosure with respect to

25  the relationship or the lack of relationship, frankly, of the

1  purchasers to the Debtors and other interested parties.  And

2  so again I'm satisfied with respect to the Section 363

3  standard.

4       I also note that the Court has previously approved

5  bidding procedures and I'm satisfied again that the record

6  here demonstrates that they have been complied with or

7  appropriately adjusted as the process evolved.  And again I

8  place significant weight on the position of the estate

9  fiduciaries, the Creditors Committee, as well as the Equity

10 Security Holders, and their support for the proposed

11 transaction, and frankly their oversight participation in

12 that process as it played out over many hours with Debtors

13 counsel.

14      I would note that again I'm satisfied with the

15 proffers of Mr. Schmidt and Mr. Breder that were presented.

16 But I would observe that it is a practice that I would not

17 recommend on a going forward basis.  It's been this Court's I

18 think pretty consistent approach that to present a witness by

19 proffer requires that the witness be present in the

20 Courtroom.  And had any issue arisen or had anyone asked the

21 opportunity to ask a question of any of these I would have

22 adjourned this hearing to next week.  That has happened on a

23 number of occasions.  I am not going to make an issue of it

24 because of the nature of the case and the presentation that

25 was given.

1    I make obviously no criticism about the sufficiency

2    of the record before me, but I would simply caution counsel

3    that if a proffer is going to be made the witness needs to be

4    here irrespective of whether there is an expectation that

5    there is going to be or would not be cross examination.  So

6    that's just an observation.

7    This issue arose downstairs with one of my

8    colleagues recently and there was a good deal of frustration

9    that a hearing was adjourned for what turned out to be I

10   think a three minute long cross examination and a two week

11   delay.  And so again I would observe that that's a practice

12   that I would at least comment upon.

13   But the transaction itself I'm satisfied with

14   respect to the documentation.  I've had an opportunity to

15   review first the blackline order that was sent over yesterday

16   and I appreciate getting that in advance of the hearing.  And

17   then the blackline, the final revised version that's been

18   presented here.  And I am satisfied that again it is

19   compliant with the statutory requirements as well as

20   consistent with the record developed in this case.

21   The final observation with respect to the Maschhoff

22   bid I would note that paragraph 42 provides for the payment

23   of the breakup fee and the expense reimbursement, both of

24   which from the record before me seem to have been well

25   earned.  And the breakup fee is obviously due and payable in

1  connection with the closing and that is a fixed sum.

2       And it's my understanding that there will be

3  documentation relating to the expense reimbursement.  And

4  that process will play itself out.  And I don't expect any

5  issues, but I do think it is both appropriate and good

6  practice to build that into the order so there is never any

7  uncertainty.  But I am approved this sale.

8       And Mr. Brady, if you've got a clean, final form of

9  order I will enter it.

10       MR. BRADY:  I do, Your Honor.  If I may approach I

11  also have the KEIP order.

12       THE COURT:  Very good.  Thank you.  When do you

13  expect to close?

14       MR. BRADY:  Your Honor, closing and we're going to

15  get to that in connection with the cash collateral.  Its

16  anticipated closing would be around September 13th.  That

17  turns out to be Friday the 13th.  There are those in Mr.

18  Grier's world that don't think that's a good day to close.

19  So we're thinking maybe the 12th or even it could slide to the

20  Monday after, but in that range.

21       THE COURT:  Have you asked for a waiver of the 10

22  day stand to Rule 6004(g)?

23       MR. BRADY:  I don't believe that it's in there.

24       THE COURT:  It doesn't sound like you would need

25  that waiver.  I just want to make sure you're not going to

1  close early.  Okay.

2          MR. BRADY:  I don't think we asked for it, Your

3  Honor.

4          THE COURT:  Yeah, you don't need it on that

5  timeline.  I just wanted to make sure because I think I do

6  need to make an express finding with respect to that.  But if

7  that becomes an issue then you can get me on the phone.  But

8  it sounds like you've got some work to do to get there and it

9  will probably take a couple weeks to get to that point.

10          MR. BRADY:  That is always a challenge, Your Honor,

11  with a bidder who wins at the auction as opposed to the one

12  you have been dealing with for months.  So we've got our work

13  cut out for us to get there.

14          THE COURT:  Both of those orders have been signed.

15  We'll ensure that the sale order itself is on the docket this

16  afternoon.

17          MR. BRADY:  I do appreciate Your Honor's comments on

18  the proffer and the witnesses who were on the phone.

19  Frankly, we were quite certain that no one was objecting to

20  adequate assurance.  And someone had any issue we were going

21  to continue that with respect to them and not put the Court

22  in that position.  But we do appreciate Your Honor's

23  comments.

24          THE COURT:  I want to be clear because, look, I

25  understand the wisdom of it.  I've had situations where a

1  buyer doesn't have a witness because he's going down to North

2  Carolina to make sure he's got control of what he just bought

3  last night.  And that makes sense, but it does put the Court

4  in a difficult situation.  And the last thing I would want to

5  do is put people to expense and delay.  But, you know, again

6  if someone wants to cross examine I think that we have been

7  consistent that cross examination, one, I will never allow

8  cross examination of a witness that is not in the Courtroom.

9      And second I will almost never permit an attorney

10  not in the Courtroom to examine a witness.  And those are

11  sort of received wisdom.  I don't think its part of anybody's

12  Chambers' procedures, but it's just too difficult to manage

13  that process over the phone.  There are times where we are

14  flexible, where circumstances require.  And again today I am

15  certainly happy to oblige, but it is a bit fraught with risk,

16  okay.

17      MR. BRADY:  Thank you, Your Honor.

18      THE COURT:  Sure.

19      MR. BRADY:  One final matter, Your Honor that we did

20  file this morning and ask to be heard today, cash collateral

21  usage expires at 11:59 p.m. tomorrow night.  We had talked

22  with the Lenders and the other parties about working on a

23  longer term cash collateral budget now and there simply

24  wasn't sufficient time from the end of the auction till now.

25  So this is just a two week, basically a two week extension.

1      You're going to hear a little more about this, but

2  just the Debtors' view.  We've been lucky, Your Honor, in the

3  sense that all our cash collateral budgets are cash budgets.

4  And there have been no professional fee line because no

5  professionals would be eligible for payment under the interim

6  comp order through the time we thought the banks would be out

7  of the case.

8      Obviously, now with the new structure the banks

9  aren't going to be out of the case longer.  So we now need to

10  get into that discussion over what, if any professional fees

11  would be paid in affect ahead of the banks before they're

12  finally paid out.

13      I think we've all agreed to reserve those issues

14  now.  Again the next two weeks there are no professional fees

15  that would come due.  They are accruing in the sense that

16  people are working and preparing fee applications.

17      THE COURT:  Right.

18      MR. BRADY:  But the Lenders, the two Committees, the

19  Debtors, we're all going to work hard over the next couple of

20  weeks to see if we can reach an agreement.  But if not we are

21  going to be back here on a longer term cash collateral budget

22  to get us through the anticipated payout.  And it may become

23  an issue of what professional fees are allowed under that

24  budget.

25      But I have a really short order that does just a

1  couple of things.  It extends the existing cash collateral

2  order from really August 30th to September 13th.  The

3  Committees' lien challenge period currently expires on

4  September 21st.  The Lender was anxious to have that expire

5  prior to close.  It did reach an agreement, the Lender and

6  the Committee to move that lien challenge period up to expire

7  on the 13th.  And the Committee is agreeable to that.

8         And again this also includes the requirement of a

9  pay down on closing of at $48 million dollars consistent with

10  the sale order.  So I have that order.  I know others want to

11  be heard, but I'll hand that up to the Court.

12         THE COURT:  Sure.  Okay, all right, I'll hear from

13  anybody else that wishes to be heard with respect to the

14  first amendment to the cash collateral order.

15         MR. BRADY:  Your Honor, no one was this shy before

16  the hearing.

17         THE COURT:  Yeah.

18         MR. ZAHRALDDIN:  I was just waiting for people

19  closer to the podium to stand up.  Your Honor, Rafael

20  Zahralddin for the Official Committee of Equity Security

21  Holders.  We reserve our rights on the cash collateral.  We

22  agree that there should be an extension.

23         THE COURT:  I view this as a placement.  I mean it

24  preserves the status quo.  As of earlier this week you had

25  bigger fish to fry.  And people will turn to both getting to

1  closing and figuring out the economics of the case on a go

2  forward basis.  And this gives you a couple of weeks to do

3  that.

4          MR. ZAHRALDDIN:  And that's exactly the way we would

5  like it as well.  So we are happy to hear you say that Your

6  Honor.

7          THE COURT:  Well, I'd like to know if everybody

8  agrees with that.  Is that pretty much accurate, Ms. Kelbon?

9          MS. KELBON:  Yes, Your Honor, it is accurate.  We

10 reserve all of our rights because as I expressed, Your Honor,

11 our expectation is to get it paid out as quickly as possible.

12         THE COURT:  And there's a discussion that we'll be

13 having and we'll deal with that.  Mr. Wheeler.

14         MR. WHEELER:  Yes, Your Honor, the Committee agrees

15 as well.  We have no problem with the bridge order so to

16 speak.  We did negotiate a shortened lien challenge period

17 that will end on the 13th.  And I think that's accurately

18 reflected in paragraph 5 of the proposed order.

19         THE COURT:  Sure.

20         MR. WHEELER:  And we reserve all our rights.

21         MR. ZAHRALDDIN:  Our only concern was being part of

22 the case, but not being officially part of the case.  And so

23 I think those concerns have been allayed by both Your Honor's

24 comments and our discussion prior to the hearing.

25         THE COURT:  Thank you, that sounds fine.  Okay, does

1  anyone else wish to be heard?  Okay, I'll go ahead and enter

2  this amendment.  Again I think I understand precisely what it

3  is.  I understand that some issues remain out there.  And I

4  am satisfied that all parties have reserved their rights for

5  what I expect would be a robust discussion.  But I will leave

6  you to that.

7          That actually just raises, I think the next sort of

8  housekeeping question, Mr. Brady, which is do we have a

9  hearing lined up?

10         MR. BRADY:  Your Honor, I believe September 30th is

11 the next hearing.

12         THE COURT:  Yeah, I see September 30th.

13         MR. BRADY:  And I think we had another one in

14 September that was set aside I think just for the

15 [indiscernible] retention.  That's my recollection.

16         THE COURT:  I se AgFeed on the 16th which creates an

17 issue, right because you expire on the 13th.

18         MR. BRADY:  We were thinking of contacting Chambers

19 to the extent it's necessary.  I mean obviously if we reach

20 agreement maybe we can present this as a second amendment on

21 a consensual basis, but if not we would need another hearing.

22         Mr. Buchbinder has it set for the 341 for the 11th.

23 So Mr. Maib will be in on the 11th.  So maybe it's possible to

24 reserve a little time in the afternoon of the 11th so that Mr.

25 Maib can make one trip that week.  And we can have it as a

1  placeholder just for cash collateral if necessary.

2       THE COURT:  That works for me.  I'll tell you though

3  that it looks like I have something on my docket starting at

4  10:00 a.m. and I have no idea what to expect with that and

5  I'm sure I'll learn probably next week. So the answer is I

6  can probably give you between 30 and 60 minutes on the

7  afternoon of the 11th.

8       You know if it's the whole dog and pony show of a

9  fight over contested cash collateral then we are going to

10  need to talk.  And I will be able to accommodate the party's

11  needs and we'll be able to figure that out.  But, you know,

12  my hope would be the issue gets resolved or at least is

13  structured to allow the process to move forward, and maybe

14  rights reserved, and a further order, and reservations on the

15  record that sort of thing.  And for that I would certainly be

16  prepared to accommodate the parties.

17       Why don't we plan for, let's go with 1:00 on the 11th

18  of September.  And again that's probably; if this is a trial

19  that I have starting at 10:00 then I'd just fit you in during

20  the lunch break.

21       MR. BRADY:  Okay.

22       THE COURT:  If you don't need it let me know.  And

23  if it's consensual or you know, again you sort of hold it

24  together and a further extension then that's fine.  I would

25  take that under certification as long as everybody is on

1  board.

2          MR. BRADY:  Thank you, Your Honor.

3          THE COURT:  All right.

4          MR. BRADY:  And that is all we have from the

5  Debtors.

6          THE COURT:  All right, does anyone else have

7  anything?  All right, we'll stand in recess.  Again I

8  congratulate the parties on the results of the auction and

9  your collaborative and good work.  We'll stand in recess.

10      (Court Adjourned).

11

12

13

14

15                       CERTIFICATE

16  I certify that the foregoing is a correct transcript from the

17  electronic sound recording of the proceedings in the above-

18  entitled matter.

19  /s/Mary Zajaczkowski                    September 4, 2013

20  Mary Zajaczkowski, CET**D-531                  Date

21

22

23

24

25